BRAXTON *et al.* *v.* RICH *et al.*

(*Circuit Court, D. West Virginia.* September 2, 1891.)

1. PUBLIC LANDS—GRANT BY STATE—CONSTRUCTIVE POSSESSION.
   A grant from the commonwealth of Virginia for land not previously granted, conveyed to the grantee therein not only the title of the commonwealth therein, but the constructive possession of the land to the extent of its boundaries.

2. SAME—SUBSEQUENT GRANT OF SAME PREMISES.
   A subsequent grant to another, covering a part of lands previously granted, did not vest in the grantee either the title or the constructive possession of such previously granted lands.

3. SAME—LANDS FORFEITED TO STATE.
   A tract of land forfeited to the commonwealth of Virginia, or the title to which vested in that commonwealth by purchase at a sale thereof for the non-payment of the taxes thereon, situate in any of the counties now forming parts of the state of West Virginia, and not disposed of prior to the formation of that state, became the property of that state on the 20th day of June, 1863, subject to redemption by the former owner within five years from and after that date, as provided in the constitution and laws of the state; and, when not so redeemed, the land became the

absolute property of the state of West Virginia, and must be sold for the benefit of the school fund of the state, if not already so disposed of.

**4. SAME—SALE FOR BENEFIT OF SCHOOL FUND.**
All lands within the counties now forming the state of West Virginia, the title to which was in the commonwealth of Virginia on the 20th day of June, 1863, when the first constitution of West Virginia took effect, became the property of the state of West Virginia at that date, except such as were subject to redemption by the former owner as aforesaid, and must be sold for the benefit of the school fund of the state, if not already so disposed of.

**5. SAME—TAXATION.**
Lands belonging to the state of West Virginia, whether as forfeited, waste, and unappropriated, or otherwise, are not the subjects of entry for taxation on the land-books of any county, and are exempt from all taxation, state or local; and the entry of such land upon the land-books of any county, and a charge of taxes thereon, is illegal, null, and void for any and all purposes whatever.

**6. SAME—TAX-SALE.**
The return of any such lands as delinquent for the non-payment of the taxes charged thereon, and the sale thereof for such taxes, are illegal, null, and void, and the purchaser of any such lands at such sale derives no title or right of any sort to the lands so purchased.

**7. SAME—EFFECT OF TAX-DEED.**
A deed executed to the purchaser of such lands, or to another by his direction or otherwise, is inoperative, null, and void for any and all purposes whatever, and the grantee in every such deed, having no right or title to the lands therein attempted to be conveyed in himself, can convey no sort of right or title to the lands therein mentioned to another.

**8. SAME—SUBSEQUENT PURCHASERS.**
Every such deed, and the proceedings leading to its execution, being absolutely illegal, null, and void, a subsequent purchaser of the same lands from a person holding or claiming mediately or immediately under any such sale, purchase, and deed derives no right or title to the lands so purchased, whether he has any actual notice of the facts which rendered such sale, purchase, and deed illegal, null, and void or not.

**9. SAME—REDEMPTION OF FORFEITED LANDS—CONSTITUTIONAL LAW.**
The act of the legislature of West Virginia allowing the former owner of lands forfeited to that state to redeem the same from such forfeiture is valid and constitutional.

**10. TAX-SALE—REPORT OF SHERIFF.**
It was the duty of the sheriff making a sale of lands for the non-payment of the taxes assessed thereon in West Virginia, under the law of that state as it was in 1869, to state in his report of sale the estate in said lands so sold by him, and his failure to so state and report rendered his sale absolutely null and void, even if it was in all other respects legal and valid.

**11. ADVERSE POSSESSION—SEVERAL PARCELS HELD UNDER DIFFERENT TITLES.**
Several adjoining and contiguous tracts and parcels of land, owned and held by the same person under different titles, constitute for the purposes of possession but one tract in law, and, if the owner thereof has the actual possession and occupation of any part of said lands, such possession, in the absence of an adverse possession by another of some part of the lands so held and owned by him, extends to the exterior boundaries of the whole of his said lands.

**12. SAME—OUSTER.**
A person in the actual possession and occupation of lands owned by him under the older title thereto cannot be ousted from such possession by the entry thereon by another claiming under a title junior to that of the owner of the elder title, except to the extent of the actual possession and occupation of such junior claimant; and it is incumbent upon such junior claimant to show by proof the extent of his said possession and occupation, to make it available for any purpose.

*(Syllabus by the Court.)*

In Equity. Bill by Tamlin Braxton and others against Benjamin Rich and others to remove cloud from title.

*Jas. H. Ferguson,* for plaintiffs.

*Caleb Boggess, John A. Hutchinson,* and *John F. Keator,* for defendants.

JACKSON, J. This suit was instituted on the 8th day of August, 1881, in the circuit court of the county of Webster, in the state of West Vir-

ginia, and was removed to and docketed in this court at its June term, 1882, at Parkersburg. The object and purpose of this suit is to remove a cloud upon the title of the plaintiffs to large tracts of land claimed by them to be embraced in this proceeding. It is unnecessary at this time to enter into a detailed statement of the long and tedious proceedings by which the case was brought to hearing. It is sufficient to say that all of the parties interested in the controversy are now regularly before the court, and the case is now to be heard for a final decree under the provisions of a consent decree heretofore entered.

Prior to the creation of the state of West Virginia, Allen T. Caperton, then a citizen of Virginia, was seised in fee of large tracts of land situated in the counties of Webster and Nicholas, now in the state of West Virginia. He derived his title mediately from various grants of the commonwealth of Virginia,—one issued to Robert Morris on the 2d day of March, 1795, for 153,900 acres of land; another, issued to Abner Cloud for 5,000 acres, dated March 10, 1790; another, issued to A. C. and D. B. Layne, for 2,738 acres, dated September 1, 1851; also two grants issued to Austin Hollister,—one for 9,333 acres, dated November 1, 1855; and another, for 5,938 acres, dated February 1, 1858. These surveys were coterminous surveys, binding on each other, and, under the laws of the state, constituted one tract. The said grants to Robert Morris and Cloud being older than that to McCreery, under which the defendants claim, which will be noticed hereafter, gave to said Morris and Cloud the constructive possession of the whole of the lands included within the bounds of their respective grants, of which they were not, and could not be, divested by the junior grant to McCreery; and this possession passed to and vested in each of the grantees in the several deeds of conveyance of said lands mentioned in the bill down to and including the said Allen T. Caperton, the ancestor of the plaintiffs, as to that part of the lands so granted to Robert Morris, purchased by him as appears hereafter, and the 5,000 acres granted to Cloud; and the same is true as to the tracts granted to A. C. and D. B. Layne, and to Austin Hollister. Under the laws of Virginia the title to all the lands included in these grants was in the commonwealth of Virginia at the date of the said grants, and the said Caperton not only acquired a good and valid title to all of said lands under his deeds therefor, but the constructive possession thereof also; and, as each of the said tracts adjoined and were contiguous to his other lands, above named, his actual possession of those lands hereinafter mentioned extended to and over these several tracts also, from and after the dates of his deeds therefor. The bill alleges, and the pleadings and proofs sustain the allegation, that Caperton had a regular chain of title from the commonwealth of Virginia down to himself for the lands in controversy. This is conceded; but it is claimed by the defendants that he has been divested of his title by reason of adverse holdings and by a forfeiture of his lands. It therefore becomes necessary to investigate, first, the question of his possession of the lands in controversy, and whether there were any parties holding adversely for a period of time sufficient to ripen their claims into an absolute title.

The evidence shows that all the lands in controversy were regularly entered in the name of Caperton on the land-books of the proper counties, and the taxes charged thereon were all paid by him up to and including the year 1873. As to the possession of these lands by said Caperton, the evidence shows that as early as the month of April, 1865, one Solomon Taylor was in the actual possession and occupation of a part of the lands then owned by Caperton, as his tenant, and claiming his possession and occupation thereof as the tenant of Caperton. The lands so possessed and occupied by him were a part of the said Robert Morris tract, purchased by Caperton, as above referred to. His improvements thereon consisted of a log cabin, in which he lived, and a few acres of land inclosed, cleared, and cultivated by him, and had the appearance of being old. He remained on this land as the tenant of Caperton until the year 1869, when he purchased from Caperton some 300 acres of the land formerly belonging to Morris, which embraced his said improvements. About the same time, in the spring of 1865, when Taylor was found in possession of said land, a man by the name of Thompson was on the lands acting as the agent of Caperton, locating and surveying them, and exercising supervision over them. In the spring of 1868 Caperton put Samuel Hinkle on that part of his said lands which were formerly a part of the Robert Morris tract, as his tenant and agent, and gave him the general charge of the whole of the lands then owned by him as above stated, with instruction to protect the timber thereon from waste and destruction, and to prevent squatters from settling upon them. Hinkle remained there as such tenant and agent of Caperton until the month of June, 1876, when Caperton died, and from that time to the institution of this suit he remained on said lands as the tenants of the plaintiffs. On the 8th day of July, 1874, George M. Sawyer, as the agent of Caperton, leased a portion of the land in controversy, lying on Williams river, to Mark Hammons, being the place where a man by the name of Mullen had once lived as a squatter, who took possession of the land under his lease, living there until he assigned it to M. J. Stiltner, on the 14th day of May, 1875; and on the 21st of September, 1876, Stiltner assigned one-half of his leased premises to R. C. Clevenger, who entered upon the land, holding possession of the same until the spring of 1877, when he and Stiltner sold their tenancy to Peter Hammons, who took possession of the premises under them. The leased premises were afterwards occupied by Jesse Hammons, who derived his right from Peter Hammons; and he sold his right to John Lee, who entered upon the leased premises. All of these persons in law were the tenants of the plaintiffs, and of those under whom they claimed. It will be perceived that the constructive possession of the lands in controversy, under the proofs in this cause, in the absence of an actual, adverse possession, which does not appear, was with the said Caperton up to the time that Taylor became his tenant of the lands mentioned above, and that the said Caperton had the actual possession of all of his said lands, at least from the month of April, 1865, to the time of his death, unless that possession was disturbed by the operations

of the defendant Rich, which commenced on the 10th day of May, 1872, by his lease to Mullens. And if the defendants had proved an actual, adverse, and continued possession of all the lands embraced in this lease from its date to August 8, 1881, when this suit was commenced, but which they have not done, it would not have been sufficient to bar an action of ejectment by these plaintiffs for the recovery of the possession of these lands.

The next question that invites the attention of the court is the question of forfeiture. That we may have a clear conception of this question it is necessary to refer somewhat to the history of the country during the late war. The county of Webster, in which the great body of this land lay, was created in 1860, and, the war coming on in 1861, no land-books for that county, in this state or in Virginia, were made out until after the war, in the year 1866. In that year the lands were regularly entered on the land-books of Webster and Nicholas counties in the name of Caperton, and taxes charged thereon from year to year, which were all paid by him to and including the year 1873. For the year 1874 they were returned delinquent for the non-payment of taxes, and in the month of September, 1875, the whole of them were sold for taxes, and purchased by the state of West Virginia. Under the law of the state, Caperton had a right to redeem said lands from sale within one year from its date, and during that period of time the state acquired no title to the land, but the title remained in the party who held it at the time of sale. In the month of June, 1876, three months before the period for redemption of the lands had expired, Caperton died intestate, leaving the plaintiffs in this action his heirs at law, with the same right to redeem the lands that their ancestor had, which, however, they failed to do, and thereupon the lands became forfeited to the state of West Virginia, and subject to sale for the benefit of the general school fund. Under the forfeiture, proceedings were commenced in the circuit courts of the counties of Nicholas and Webster to sell the lands for the benefit of the school fund, when the plaintiffs in this action, as the former owners of said land, filed their petitions in the circuit courts of said counties for their redemption from forfeiture, in pursuance of the statutes of the state enacted for that purpose. Upon these proceedings decrees were entered allowing the former owners to redeem the lands upon the payment of the taxes, interest, costs, and damages due the state, which they did, whereby they became reinvested with the title to the land, unless the title thereto had vested in the defendants, or some of them, as claimed by the defendants in this suit, to which we will hereafter refer. Prior to the creation of the state of West Virginia there were large bodies of land west of the Alleghany mountains, in Virginia, designated and known as "waste and unappropriated lands," which belonged to the mother commonwealth. Under the law as it then existed these lands were subject to entry and survey by any one who would purchase the land-warrants for that purpose from the register of the land-office of Virginia. The purchaser would locate his warrants on any land owned by the commonwealth. It did not sell him any particular parcel of land;

and, if he desired to do so, he could make his survey so as to include lands already located by others, but he was required to note the fact in his survey, and obtain his patent by the lines of his survey.  If, in locating his warrants, he embraced within the boundaries of his survey any portion of land previously located, he did not obtain a title thereto. This was called an "inclusive survey."  He could, at his peril, make his location without regard to prior locations, by causing the land to be surveyed, and filing his survey in the land-office; and, if not stopped by legal proceedings in due time, a grant would be issued to him according to the lines of his survey.  In this way grants were often issued covering in whole or in part the same lands, which gave rise to the great confusion that exists in Virginia and West Virginia land titles.  In cases of this character the strength of the respective titles not unfrequently rested upon the possession of the property and the payment of taxes by the adverse claimants.  This state of things grew out of the fact that when the surveys of the lands in question in this suit were made, that part of Virginia west of the Alleghany mountains was mostly an unbroken wilderness, and surveys of lands in that part of the state were hurriedly and inaccurately made, and often, without the knowledge of the person making them, they covered, in whole or in part, previous surveys made for others; and the legislature of Virginia at an early day provided, by appropriate legislation, how waste and unappropriated lands might be entered and surveyed, and titles thereto procured, and how lands delinquent for the non-payment of the taxes thereon should be returned and sold therefor, and when, how, and for what reasons such delinquent lands should be forfeited and disposed of.

In this case, as the evidence shows, John B. Shreve, an old surveyor, had in some way obtained possession of the official record-book of surveys made in Randolph county, Va., prior to the year 1800.  He lived in the county of Upshur, and his possession of that book, so far as appears, was illegal.  It contained the record of many large surveys made in Randolph county, which were afterwards embraced in the counties of Nicholas and Webster, both of which counties are now parts of the state of West Virginia, and it formed the ground-work of the illegal and fraudulent scheme worked up by Shreve, as shown by the pleadings and evidence in this cause.  While the surveys showed the names of persons for whom they were made, they did not show which of them had been carried into grant.  Shreve, being an old man, had learned from the surveyor who made the surveys in question in this suit their location and boundary lines, so as to enable him to identify them.  None of the tracts of land contained in these surveys were entered on the land-books of Webster or Nicholas counties, or any other county in the state of West Virginia, until Shreve had them entered and charged with taxes on the land-books of Webster and other counties for the year 1868 in the names of the several persons for whom they had been surveyed or granted, so far as known.  After the entries were made, they were returned delinquent for the taxes for that year, and were sold for the non-payment of the taxes so charged and not paid.  When Shreve had these lands as-

sessed and caused them to be entered on the land-book, being well informed as to the history of these old surveys, as well as to the laws relating to the payment of taxes and forfeiture, he must be held to have known that they would be sold in the absence of any of the persons in whose names they were entered and charged with taxes. The evidence shows that they were sold and were purchased by such persons as might be induced to invest in them at a nominal price. A notable fact in this connection is that no persons outside of Shreve's family, in West Virginia, were interested in the purchase, except the assessor of the county of Webster, to whom we shall refer again; but all the purchasers were men that resided in Pennsylvania, and not in West Virginia. It is evident that he had arranged with the purchasers prior to the sale to become interested in the lands at the tax-sales. By some arrangement he induced the assessor of Webster county to enter these old surveys on the land-books of that county, and charge them with the taxes for the year 1868, in the names of the several persons for whom they were surveyed and granted, so far as they had been granted. He addressed a note to the assessor, asking him to put them upon his books at a nominal valuation, to-wit, five cents per acre, stating that it would furnish a large revenue to the state, as well as to the county; and told him to let a man by the name of Sawyer know at what price per acre the lands were entered, so that he could inform the parties interested with him, who were non-residents, of the valuation per acre that he had put upon the lands. At this time Shreve exhibited no title to the assessor for the lands that he desired to place on the land-books, nor does the evidence disclose that he had any other than a future speculative interest in them. There was no conveyance of any character, and no chain of title for these surveys from the grantees down to him or to any one else. Previous to the action of Shreve the title to the lands had slept for nearly a century, and, until Mr. Shreve conceived a notion of placing these lands upon the books, (with the view of fraudulently obtaining a claim of title,) apparently as a matter of speculation, the evidence in this cause does not disclose that the parties or their heirs in whose names the lands were surveyed or granted had at any time ever presented themselves to the proper officer to have them entered upon the assessor's books for assessment under the laws of the state, or to ascertain the back taxes and damages that were due with a view to redeeming them from forfeiture; nor had the state, so far as the evidence in this case discloses, ever taken any action through her officers to have the lands sold in the names of those persons in which the surveys were made or the grants issued, until Shreve had them placed upon the land-books in 1868. His action, so far as the papers and the evidence in this cause disclose, was illegal. He had no interest whatever in them, and under the laws of the state he had no right to have those lands entered upon the assessor's books, unless he was acting for the former owners as their agent, (for which there is no pretense,) or was invested with the title. Chapter 118, Acts 1863, § 28, pp. 159, 160. The action of the assessor of the county of Webster in placing them upon the land-books at the instance of Shreve was not only illegal, but savors

so strongly of a conspiracy between **Shreve** and himself that I must hold the action as fraudulent in its inception and execution.

Among the different tracts Shreve caused to be entered in this way, which interfered with the lands of the plaintiffs in question in this suit, are the following: One of 100,000 acres, granted to William McCreery, on the 21st day of January, 1796; but this grant is a younger one than those to Morris and Cloud, under which, in part, the plaintiffs claim, and, being an inclusive survey, did not pass to McCreery any land which had been previously granted. The next was a tract of 12,500 acres, which was surveyed in the name of George Messingbird; but while the land-books of Randolph county showed the survey to have been made, (from which Shreve took his copies,) the evidence clearly shows that it was never filed in the land-office of Virginia, and that no patent for any such tract was ever granted to any one. The next is a tract of 105,000 acres, in the name of James Welch, which the proofs show was never granted to any one. There being no grants for either the 12,500 acres or the 105,-000 acres, although a survey had been made upon the surveyor's books of Randolph county, at the dates referred to, the land still remained in the commonwealth of Virginia, now West Virginia, and no title passed to any one, and their entry upon the land-books of Webster, Nicholas, and other counties was an attempt to make a title which never in fact existed. The next was a tract of 58,000 acres. The evidence shows that, if this survey was ever made, it was never filed in the land-office of Virginia, and carried into grant. But it is shown by the evidence that Banks made 53 contiguous surveys, amounting in the aggregate to 58,500 acres, numbered consecutively from 1 to 53, but that only 43 of said surveys were ever filed in the land-office of Virginia, and that grants were only issued to Banks for 9 of them, amounting to 9,000 acres. It is very clear from the evidence that, while a portion of these lands lie within a portion of the grants under which the plaintiffs claim, yet all of the 9 tracts granted to Banks lie entirely outside of the lands of the plaintiffs as claimed in this action. But, if this were not so, the same question of fraudulent entry of these several tracts of land exists as to them, to which I have heretofore referred. Shreve had no legal connection with, and no legal interest in, nor any legal title whatever to, any of them, and the evidence does not show that he was authorized by any of the heirs of Banks or those claiming under him to have these lands assessed with the back taxes and entered upon the assessor's books. As I have before stated, this is not only so in reference to the Banks tracts, but is equally so in reference to the tracts heretofore referred to; and therefore his acts in this instance were in plain violation of law, and the entry of these lands upon the assessor's books, being in plain violation of law, was void, and the sale of these lands for the non-payment of taxes for the year 1868 was illegal and void, and the parties who became the purchasers at that tax-sale acquired neither an equitable nor legal title to the lands sold at that time under the circumstances surrounding that sale.

As to the McCreery tract, this tract was entered on the land-books of Nicholas county, Va., and charged in the name of William McCreery, the

grantee, with the taxes for the year 1840, and for each year thereafter to and including 1850, and was returned delinquent for the non-payment of the taxes charged thereon for each of said years. In that year it was sold for the taxes then due and in arrears, by the sheriff of the county, and purchased by him for the commonwealth of Virginia, and was never redeemed. By this proceeding the title of McCreery became vested in the commonwealth of Virginia, and remained in it until the creation of the state of West Virginia, when it became the property of that state, subject to redemption by the former owner within five years from the 20th day of June, 1863, the day on which the first constitution of the state took effect. Const. art. 9, §§ 3–5. The legislature of West Virginia, on the 2d of March, 1865, passed an act to give effect to these provisions of the constitution, (Sess. Acts 1865, c. 92, §§ 2, 3,) as follows:

"Sec. 2. All lands in this state heretofore vested in the state of Virginia by forfeiture or by purchase at the sheriffs' sales for delinquent taxes, and not released or exonerated by the laws thereof, or by the operation of the seventh section of the ninth article of the constitution of this state, may be redeemed by the former owners, by payment into the treasury of this state, upon the certificate of the auditor, of the amount of taxes and damages due thereon at the time of such redemption, on or before the twentieth day of June, eighteen hundred and sixty-eight. Sec. 3. All waste and unappropriated lands within this state, and all lands in this state heretofore vested in the state of Virginia by forfeiture or by purchase at the sheriffs' sales for delinquent taxes, not released and exonerated, or redeemed in the manner prescribed in the second section of this act, shall be sold for the benefit of the school fund, in the manner hereinafter directed."

The evidence shows that the former owner of this tract of land failed to redeem it from forfeiture, as provided by the constitution and laws of West Virginia, and the right to do so expired on the 20th day of June, 1868, and from and after that day the tract was absolutely irredeemable by any person whatsoever, and, as I have before stated in regard to the other tracts, the entry of this tract of land by Shreve on the land-books of Nicholas county was unlawful and void for any purpose. If it could have been entered for taxation at all in 1868, Shreve had no right to enter it, because he was neither the owner, nor had he any visible interest in it; and the owner of it, if living, could not have had it entered without having paid the back taxes and damages for which it was sold in 1850, and the taxes which had accrued since that time upon it. The title to all the lands so procured by Shreve to be entered on said land-books and charged with taxes thereon, which are in question in this suit, being in the state of West Virginia, they were not subject to entry in the land-books of any county, nor liable to taxation; and the entry of said lands in the land-books, and the charge of taxes thereon, were illegal, null, and void. After Shreve had the lands entered on the land-books with the view of securing a sale, the parties from Pennsylvania, with whom he had been in correspondence, made him a visit, and he went with them on the lands, and entered into an agreement with them whereby they were to become the purchasers. Subsequently one Albert Owen, of the same state, also negotiated with him in regard to the purchase of

the lands. It is apparent that all of these parties, including Owen, were fully informed of the legal *status* of these lands when they all entered into the fraudulent plans and schemes of Shreve to manufacture a title to them. Therefore they must be held to be purchasers with notice of the fraud practiced by Shreve, if in fact they were not actual parties to it. The contract entered into between Shreve and Owen on the 1st day of May, 1869, discloses fully their purpose, and clearly supports this view of the case. After this contract was made, Shreve abandoned the negotiations with the parties he first contracted with, and Owen, having associated the defendant Rich with him, they attended the tax-sales, and, together with G. P. Shreve, purchased all of the various tracts of land heretofore referred to, and which Shreve had caused to be entered for sale, amounting to nearly 300,000 acres, for a sum less than $100. After the sale and the purchase of this large body of lands, the recorder executed deeds to the purchasers, and they executed deeds to each of the parties for their respective interests, as is fully shown by the various deeds filed as exhibits in the papers of this cause. I therefore conclude that, the title thus acquired by the defendants (if in fact it should be so called) being a fraudulent one, the defendants took nothing under it, whether they had actual notice of the original illegal and fraudulent proceedings of Shreve and his associates or not.

At this point I might refer to the question arising upon the papers, as to the effect of the inclusive survey. I might also consider the validity of the junior patents under which the plaintiffs claim; but, in the view I take of this case, I deem it unnecessary. And in this connection it must not be forgotten that, while Shreve and his confederates were executing this scheme, the plaintiffs, and those under whom they claim, were in the quiet possession of the lands in controversy, under a regular chain of title, paying the taxes thereon to the state.

Before considering the evidence of the defendants relating to possession, I will notice their effort to protect themselves under the tax-sales of the title of Viscount de Fleury. Their connection with this sale is of the same fraudulent character as that we have heretofore referred to. There is no evidence in this cause to show that De Fleury ever had any title to the 100,000 acres of land sold in his name and purchased by the defendants. It was never charged on the land-books in his name in Webster county prior to 1870. When it was placed on the land-books of Webster county by parties who had no legal right to do so, it was clearly another step in the furtherance of the fraud running all the way through this case. Such action finds no countenance in a court of equity, and for this reason, if for no other, we must hold it fraudulent, which vitiates the so-called title of the defendants thus acquired to this tract of land. The next act of the defendant Rich to better his title was his effort to have a portion of the Welch lands entered and sold in the name of Francis Hyland. The evidence shows that no such survey was ever filed in the land-office of Virginia, and that no grant ever issued thereon, and no such tract was ever charged with taxes on the land-books of either state until this effort to manufacture a title in this manner. The

deeds thus acquired for this land that had no legal existence conferred no title upon the grantees, the defendants.

So far I have considered the question of title to the lands in controversy up to the date of the forfeiture of the Caperton title. When Caperton died intestate, as already stated, he was seised and possessed, both in law and in fact, of a fee-simple estate in the lands claimed by him. After his death the lands descended in this condition to his heirs at law, who are the plaintiffs in this action, and they so held them up to the time of the forfeiture to the state of West Virginia. As I have before said, they, by proper proceedings under the laws of the state, redeemed the lands, and became reinvested with the title, so that at the institution of this suit their chain of title was in itself complete. This disposes of the position of the defendants that the plaintiffs have no title to the lands in question, or any part of them, and cannot, therefore, maintain this action.

The next obstacle presented by the defendants is that the law authorizing the redemption of forfeited lands is unconstitutional. This question has been settled by the supreme court of this state, (*Waggoner* v. *Wolf*, 28 W. Va. 820,) in which they hold the statute allowing the redemption to be constitutional. The next contention of the defendants is that, if the redemption is legal, still the deeds acquired under the tax-sale furnish them with a sufficient color of title upon which to found an adverse possession, which, if continued for the period of the statutory bar, ripens into and becomes an absolute title, which would be a bar to the recovery of the lands in controversy by the plaintiffs; and further, that if their possession should be held insufficient to defeat a recovery in an action at law, still it is sufficient to enable them to take the benefit of the forfeited title of the plaintiffs under the present constitution and laws of the state. I have previously discussed the evidence of the plaintiffs on the question of possession, and therefore deem it unnecessary to pass upon it now, except so far as it is necessary to the proper consideration of the two positions of the defendants just stated. Conceding for the present that they had color of title upon which to found their possession, the potential question for consideration is, had they any such continuous possession as to bar a recovery? It is to be borne in mind that when the plaintiffs redeemed their lands from forfeiture their tenants were still in possession, and their title as well as their possession was fully restored in all respects as it was before the forfeiture, unless something had in the mean time intervened to prevent it. The evidence shows that the plaintiffs were in possession of their lands up to the forfeiture. After the forfeiture took place, the title to the lands passed temporarily into the state, and there remained until the redemption. During the period the lands were in the state the statute did not run in favor of the defendants. This principle was settled by this court, as now organized, in the case of *Armstrong* v. *Morrill*, and the ruling was affirmed by the supreme court in the same case. 14 Wall. 120. This action was brought on the 8th day of August, 1881. The defendants obtained their deeds September 28, 1870, a little more than

10 years (the period of the statutory bar) before the commencement of this action. The forfeiture of the lands occurred in 1876, and under the law the statute of limitation ceased to run in favor of the defendants for the reason that, by operation of law, they were transferred and vested in the state, where they remained for four years, thus cutting off the lapse of time necessary to mature the title under the statute. It is contended, however, by the defendants that they have acquired title under the provisions of section 3, art. 13, of the constitution of West Virginia, which reads as follows:

"(3) All title to lands in this state heretofore forfeited, or treated as forfeited, waste, and unappropriated, or escheated to the state of Virginia or this state, or purchased by either of said states at sales made for the non-payment of taxes, and become irredeemable, or hereafter forfeited, or treated as forfeited, or escheated to this state, or purchased by it and become irredeemable, not redeemed, released, or otherwise disposed of, vested and remaining in this state, shall be and is hereby transferred to and vested in any person (other than those for whose default the same may have been forfeited or returned delinquent, their heirs or devisees) for so much thereof as such person has or shall have had actual, continuous possession of, under color or claim of title, for ten years, and who, or those under whom he claims, shall have paid the state taxes thereon for any five years during such possession; or, if there be no such person, then to any person, (other than those for whose default the same may have been forfeited or returned delinquent, their heirs or devisees,) for so much of said land as such person shall have title to, regularly derived, mediately or immediately, from or under a grant from the commonwealth of Virginia or this state, which, but for the title forfeited, would be valid, and who, or those under whom he claims, has or shall have paid all state taxes charged or chargeable thereon for five successive years after the year 1865, or from the date of the grant if it shall have issued since that year; or, if there be no such person as aforesaid, then to any person other than those for whose default the same may have been forfeited or returned delinquent, their heirs or devisees, for so much of said land as such person shall have had claim to, and actual, continuous possession of, under color of title, for any five successive years after the year 1865, and have paid all state taxes charged or chargeable thereon for said period."

It will be observed that this article of the constitution provides for three classes of persons who may avail themselves of a title forfeited and remaining in the state. Under the first class, the person who seeks to avail himself of its possession must have "had actual and continuous possession under color or claim of title for ten years." This question involves the defendants' adverse possession, which I will consider hereafter, when I discuss that question. The second class provided for does not require possession, but under that clause of this article of the constitution that class of persons are entitled to the benefit of the forfeiture for only "so much of said land as such person shall have title to, regularly derived, mediately or immediately, from or under a grant from the commonwealth of Virginia or this state, which, but for the title forfeited, would be valid." It is intended by this clause to provide for those who held under junior grants, either from the old or new state. It is clear to my mind that the defendants in this case cannot protect themselves under this clause of the constitution, for the reason, as I have here-

tofore stated, that their pretended title was irregularly derived, unlawfully obtained, and fraudulent both in its conception and execution, and therefore they acquired no title to the lands in controversy. The remaining question under this provision of the constitution is, are these defendants included in the third class of persons protected by it? Three things are necessary to bring the defendants within its protection: *First,* they must have a claim of title to the lands in controversy; *second,* it must be under color of title. Both of these positions are untenable, for the reason that the claim of the defendants is fraudulent, and therefore could not be under color of title. As to the *third* requirement, that the defendants must have had an actual continuous possession of the land for five consecutive years, they have failed to establish any such possession of any part of the lands claimed by them, as I will hereafter show in discussing their evidence of adverse possession; and it is only so much of the "land as such persons shall have had claim to, and actual, continuous possession of, under color of title, for five successive years," etc., that he can hold under this part of the section. But there is still another reason why the defendants cannot rely upon their tax-deeds for any purpose. The sheriff who made the sales failed to report "what estate in the lands he sold," as required by the statute. This the courts have held not only to be essential, but imperative. *Jones v. Dils,* 18 W. Va. 764; *De Forest v. Thompson,* 40 Fed. Rep. 375. For these reasons the defendants have no "title to the lands regularly derived, mediately or immediately, from or under a grant from Virginia, or this state, which, but for the forfeited lands, would be valid," or otherwise.

I now propose to consider the question of adverse possession. The defendants' possession begins with a lease or contract made by James Woodzell, as the agent of Rich, one of the defendants, on the 10th day of May, 1872, with William Mullins, Sr. A close scrutiny of this contract shows that it also savors of fraud, for by its terms there is an attempt to provide for a previous possession of 16 years prior to the date of the contract, and long before the defendant Rich set up any claim to the land, when there was no legal relation between them, and when Mullins was a mere squatter. But this lease is of itself insufficient. There must be an actual, continuous possession by Mullins under it for the defendants to avail themselves of it. Woodzell states that he put Jesse Hammons and others on the lands as the tenants of Rich, but he fails to prove how long Mullins or any of the tenants occupied the land, or how much they claimed under Rich. His evidence is very unsatisfactory as to the place, length of time, or extent of the possession claimed. It is lacking in all of those essential elements that go to make up a continuous adverse possession or holding. There is an effort to prove an adverse possession sufficient to protect the defendants by different occupants claiming them as tenants. For this purpose Moses N. Barb, Peter B. Barb, Jesse Hammons, A. H. Cogar, George McFarland, and Christopher Baughman were examined. As to the Barbs, whatever possession they had, the evidence shows that they lived outside of the lands in controversy. Hammons' possession, as is shown by the contract of February 2, 1881, com-

menced in the fall of 1878, less than three years before this suit was brought. Hammons proves that Mark Hammons followed him in the possession of the land he occupied, but did not know how long he remained on it. After Mark left it, Stiltner, Clevenger, Peter Hammons, and he successively occupied this same improvement, but he fails to state how long any of them occupied it, and how long the improvement was vacant between the different occupancies of it. It is true that they speak in a general way, but upon both points the proof is unsatisfactory; and here it must be remarked that Stiltner and Clevenger were both tenants of the plaintiffs two or three years prior to the time the defendants claimed them as their tenants, and could not become tenants of the defendants until they either returned the property to the plaintiffs, or those under whom they claimed it, or abandoned it. Cogar gave his testimony in September, 1886, at which time he stated that he made an improvement under Hammons, who was acting for Rich, on the 100,000-acre tract, some 9 or 10 years before he gave his deposition. He is clearly mistaken as to the time, even if the balance of his statement is to be relied on, for the reason that Hammons had nothing to do with Rich until the fall of 1878. Besides, he fails to locate his improvement, so that we may determine whether it is within the boundaries of the lands in question. McFarland's evidence throws no light upon the questions involved. The last evidence I shall refer to is the evidence of the witness Baughman. His possession commenced in 1877, and he was still there when he gave his deposition. He locates his possession at a point outside of the lands of the plaintiffs; but, even if this was not so, it commenced too late to be of service to the defendants. From this examination of the evidence of the defendants it is apparent that they have failed by any evidence to prove the possession of this land before the suit was brought for five consecutive years. The possession attempted to be set up was of such a transitory character as to be utterly unreliable. It was not the actual, continuous possession for five consecutive years contemplated by the constitution.

I have considered all the material questions involved in the issue. It follows from what I have said that the plaintiffs are entitled to relief, and a decree will be passed setting aside the deeds from the recorder and other officers of the state purporting to convey the title under the tax-sale, and also setting aside all deeds made in pursuance of the title thus acquired.