## PEOPLE OF PORTO RICO v. FORTUNA ESTATES et al. *

(Circuit Court of Appeals, First Circuit. March 8, 1922.)

No. 1526.

1. **Removal of causes ⊗═26—Causes held removable to District Court for Porto Rico, where requisite amount involved.**

Under Jones Act, §§ 41, 42 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 3803qq, 3803r), establishing the District Court of the United States for Porto Rico, defining its jurisdiction and providing for removal of causes thereto, a cause which involves the requisite amount is removable from a local court where all the defendants are "citizens or subjects of a foreign state or states, or citizens of a state, territory or district of the United States not domiciled in Porto Rico," regardless of whether or not plaintiff is a citizen, either of Porto Rico or of a foreign state.

2. **Removal of causes ⊗═111—Bringing in new parties after removal does not oust jurisdiction.**

A federal court having acquired jurisdiction of a cause by removal is not ousted of jurisdiction by the bringing in of new parties, whatever their citizenship.

3. **Courts ⊗═315—Jurisdiction of suit against partnership is determined by citizenship of partners.**

Where the jurisdiction of a federal court of a suit against a partnership depends on diversity of citizenship the question is to be determined by the citizenship of its members, though under the law of the place of its origin it is regarded as an entity and may sue and be sued in its partnership name.

4. **Boundaries ⊗═13—"Seashore" as boundary is ordinary high-water mark.**

"Seashore" is the land lying between ordinary high and low water mark, and when named as a land boundary means ordinary high-water mark.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Seashore.]

5. **Territories ⊗═9—Cession of Porto Rico to United States did not affect prescription.**

Under general order of November 4, 1898, and Foraker Act, § 8 (Comp. St. § 3755), continuing the laws of Porto Rico in force, a prescriptive right to land which had commenced to run under Spanish Civ. Code, art. 1957, in force in the island, continued until the adoption of Pol. Code Porto Rico, March 1, 1902.

In Error to the District Court of the United States for the District of Porto Rico; Peter J. Hamilton, Judge.

Action at law by the People of Porto Rico against the Fortuna Estates and others. Judgment for defendants, and plaintiff brings error. Affirmed.

Lt. Col. Grant T. Trent, Judge Advocate, of Washington, D. C., and Joseph A. Loret, of San Juan, P. R. (Salvador Mestre, Atty. Gen. for Porto Rico, and Capt. Arthur W. Beer, Judge Advocate, of Washington, D. C., of counsel), for the People of Porto Rico.

Rounds, Hatch, Dillingham & Debevoise, of New York City (Francis E. Neagle, of New York City, and O. B. Frazer and Nelson Gammans, both of San Juan, P. R., of counsel), for appellees.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

⊗═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

*Certiorari denied 257 U. S. —, 42 Sup. Ct. 590, 66 L. Ed. —.

BINGHAM, Circuit Judge. This is an action of ejectment or "revindicacion" originally brought by the people of Porto Rico against Fortuna Estates, a New York corporation, in the district court for the judicial district of Ponce, Porto Rico. The process was served March 10, 1917. March 20, 1917, on the petition of the defendant, accompanied by the requisite bond, the cause was removed to the District Court of the United States for Porto Rico by order of the district court of Ponce, on the ground that the matter in controversy exceeded the sum or value of $3,000, not including interest or costs, and that the defendant was a citizen and resident of New York and not domiciled in Porto Rico. May 23, 1917, the people of Porto Rico moved to remand the cause on the ground that no diversity of citizenship existed. This motion was denied August 21, 1917, subject to plaintiff's exception. August 22, 1918, the plaintiff was allowed to amend its complaint and join Russell & Co., S. en C., as a defendant, it appearing that subsequent to the denial of the motion to remand Fortuna Estates had conveyed its title to the land in question to Russell & Co., S. en C., a partnership organized under the Civil Code of Porto Rico, the members of which were all citizens of a state of the Union, except one, who was a subject of Great Britain—none of the partners were domiciled in Porto Rico.

In the amended complaint, after setting out the parties, the plaintiff alleged that it was the owner in fee simple of certain land situated in the municipality of Ponce "at the place known as 'El Tuque' or 'Las Cucharas,' being known and described as follows: One hundred and seventy-five (175) cuerdas, containing a lagoon bounded on the north by the hacienda 'Reparada,' on the south by the Antillian Sea, on the east by mangrove swamp and land of the people of Porto Rico, and on the west by the Antillian Sea and lands of the hacienda 'Reparada' "; that the defendant Fortuna Estates had theretofore unlawfully dispossessed the plaintiff and that the defendant Russell & Co., S. en C., had purchased the property and was now unlawfully dispossessing the plaintiff.

In their answer the defendants denied that the plaintiff was the owner in fee simple of the land, and alleged that at the time of the commencement of the action Fortuna Estates was and Russell & Co., S. en C., now is the owner in fee simple of a certain piece of land (describing it) and that the land described in the complaint was included in and formed a part of the land described in their answer, and denied that either of them had unlawfully dispossessed the plaintiff. The defendants also filed an amended answer and, in addition to the matters above set out, alleged the following distinct defenses:

(a) That, prior to the bringing of the action, the plaintiff had leased the land to a third party for a long term of years; (b) that Russell & Co., S. en C., was the owner in fee simple of the land and that its predecessors in title had been in actual possession of it under a just title since 1842, exercising full ownership over the same; (c) that said Russell & Co., S. en C., was the owner of the land by prescription in accordance with sections 1957 and 1959 and the Civil Code of Spain, prior laws of Spain, and sections 1858 and 1860 of the Civil Code of

Porto Rico; (d) that the defendants and their predecessors in title had been in possession of the land for more than 60 years and that the cause of action is barred by prescription, in accordance with article 1963 of the Civil Code of Spain and section 1864 of the Civil Code of Porto Rico; (e) that the defendant Fortuna Estates purchased the land described in its answer from the former owner thereof, whose title thereto in dominio was duly recorded in the registry of property without any defect whatsoever, and that, as regards said land, it and Russell & Co., S. en C., are third parties under the mortgage law who have purchased in good faith and without notice of any defect in the title, and are, therefore, the owners and entitled to the possession, and that the land described in the complaint is included within the land so purchased.

The case was tried by a jury and a verdict rendered for the defendants. Judgment was entered for the defendants and the plaintiff prosecutes this writ of error.

There are 42 assignments of error by which the plaintiff undertakes to raise the following questions:

(1) Was the suit one which, by reason of the citizenship of the parties, could be properly removed to the federal District Court? (2) Did the federal District Court lose jurisdiction over the cause, the Fortuna Estates having transferred its title to Russell & Co., S. en C., after the court had denied the plaintiff's motion to remand? (3) Did prescription, other than immemorial prescription of 100 years, run against the Spanish government in Porto Rico prior to the adoption of the Spanish Civil Code and its extension to that island on July 31, 1889? (4) Could the defendants or their predecessors acquire title to the disputed land by 10 years' prescription subsequent to July 31, 1889, against the Spanish government, the government of the United States, or the people of Porto Rico? and (5) What is the seashore under the laws of Spain and Porto Rico?

[1] By the Organic Act of Porto Rico, known as the Jones Act of March 2, 1917, 39 Stat. 951, 965 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 3803qq–3803r), it is provided:

"Sec. 41. That Porto Rico shall constitute a judicial district to be called 'the district of Porto Rico.' * * * The District Court for said district shall be called 'the District Court of the United States for Porto Rico.' * * * Such District Court shall have jurisdiction of all cases cognizable in the District Courts of the United States, and shall proceed in the same manner. * * * Said District Court shall have jurisdiction of all controversies where all of the parties on either side of the controversy are citizens or subjects of a foreign state or states, or citizens of a state, territory, or District of the United States not domiciled in Porto Rico, wherein the matter in dispute exceeds, exclusive of interest or cost, the sum or value of $3,-000. * * *

"Sec. 42. That the laws of the United States relating to appeals, writs of error and certiorari, removal of causes, and other matters or proceedings as between the courts of the United States and the courts of the several states shall govern in such matters and proceedings as between the District Court of the United States and the courts of Porto Rico. * * * *"

In the Judicial Code of the United States, as amended January 20, 1914, it is provided:

"Sec. 28. Any suit of a civil nature, at law or in equity, arising under the Constitution or laws of the United States, or treaties made, or which shall be made, under their authority, of which the District Courts of the United States are given original jurisdiction by this title, which may now be pending or which may hereafter be brought, in any state court, may be removed by the defendant or defendants therein to the District Court of the United States for the proper district. Any other suit of a civil nature, at law or in equity, of which the District Courts of the United States are given jurisdiction by this title, and which are now pending or which may hereafter be brought, in any state court, may be removed into the District Court of the United States for the proper district by the defendant or defendants therein, being nonresidents of that state." Comp. St. § 1010.

"Sec. 24. The District Courts shall have original jurisdiction as follows:

"First. Of all suits of a civil nature, at common law or in equity, brought by the United States, or by any officer thereof authorized by law to sue, or between citizens of the same state claiming lands under grants from different states; or, where the matter in controversy exceeds, exclusive of interest and costs, the sum or value of three thousand dollars, and (a) arises under the Constitution or laws of the United States, or treaties made, or which shall be made, under their authority, or (b) is between citizens of different states, or (c) is between citizens of a state and foreign states, citizens, or subjects. * * *" Comp. St. § 991.

Sections 28 and 24 of the Judicial Code, as amended and made applicable by the Organic Act of Porto Rico to define the jurisdiction of the District Court of Porto Rico and the removal of causes thereto from the local courts of the island, read as follows:

"Sec. 28. Any suit of a civil nature, at law or in equity, arising under the Constitution or laws of the United States, or treaties made, or which shall be made, under their authority, of which the * * * [District Court of Porto Rico is] given original jurisdiction by * * * [the Organic Act of Porto Rico], which may now be pending or which may hereafter be brought, in any * * * [local court of the island], may be removed by the defendant or defendants therein to the District Court of the United States for * * * [Porto Rico]. Any other suit of a civil nature, at law or in equity, of which the District * * * [Court of the United States for Porto Rico is] given jurisdiction by * * * [the Organic Act of Porto Rico], and which are now pending or which may hereafter be brought, in any * * * [local court of the island], may be removed into the District Court of the United States for * * * [Porto Rico] by the defendant or defendants therein * * * [citizens or subjects of a foreign State or States or citizens of a state, territory or District of the United States not domiciled in Porto Rico]."

"Sec. 24. The District * * * [Court of the United States for Porto Rico] shall have original jurisdiction as follows:

"First. Of all suits of a civil nature, at common law or in equity, brought by the United States, or by any officer thereof authorized by law to sue: * * * or, where the matter in controversy exceeds, exclusive of interest and costs, the sum or value of three thousand dollars, and (a) arises under the Constitution or laws of the United States, or treaties made, or which shall be made, under their authority, or (b) * * * [where all the parties on one side of the controversy are citizens or subjects of a foreign state or states, or citizens of a state, territory or District of the United States not domiciled in Porto Rico]."

Counsel for the plaintiff contends that in order to give the District Court of the United States for Porto Rico jurisdiction over a cause removed thereto from the local island courts, it is not enough if it appears that the defendants are citizens or subjects of a foreign state or states or citizens of a state, territory or district of the United States, and not domiciled in Porto Rico, but that it must appear that the party bringing the suit is a citizen of Porto Rico or some sovereign power;

that a state is not a citizen and consequently Porto Rico is not. But where the citizenship and domicile of the defendant or defendants are such as they are here, we do not think that, under the removal act or the act conferring jurisdiction on the federal District Court for Porto Rico, it makes any difference whether the plaintiff, Porto Rico, is or is not a citizen. Porto Rico Railway Light & Power Co. v. Mor, 253 U. S. 345, 348, 40 Sup. Ct. 516, 64 L. Ed. 944. It is a party entitled to sue and has sued the Fortuna Estates, a corporation organized under the laws of New York, domiciled in that state, and such being the case, the latter was entitled, under the removal act as made applicable by the Organic Act of Porto Rico, to remove the case from the local courts. See Garrozi v. Dastas, 204 U. S. 64, 27 Sup. Ct. 224, 51 L. Ed. 369, decided when the Foraker Act was in force.

[2] It is also contended that, inasmuch as it appears that the Fortuna Estates, after the removal of the cause, sold and transferred its title to Russell & Co., S. en C., a partnership formed under the Civil Code of Porto Rico, all the members of which are citizens of some state of the Union, except one, who is a subject of Great Britain, and none of whom are domiciled in Porto Rico, the District Court of the United States for Porto Rico lost jurisdiction of the cause. Counsel for plaintiff in this connection asserts that the corporation known as the Fortuna Estates is dissolved and that the partnership of Russell & Co., S. en C., is a legal entity under the civil law, that it is domiciled in Porto Rico, and does not stand any differently than it would were it a corporation organized under the laws of Porto Rico.

The position that Fortuna Estates has been dissolved does not seem to be well taken. It is true that there is an allegation to that effect in the defendants' answer, but the record contains no evidence to sustain it, and it is stated in open court without contradiction that Fortuna Estates has never been dissolved, and that the allegation in the answer was made through inadvertence or misunderstanding of counsel. Furthermore, the plaintiff in its amended complaint alleges that "Fortuna Estates is a corporation organized and existing under the laws of the state of New York," and the record shows not only that it has never been discharged from the cause, but that it has been cited to appear and defend the prosecution of this writ of error, and we know that it has appeared here to defend the same.

The sale and transfer of the subject-matter of the litigation did not necessarily defeat the suit, for a purchaser or assignee of a defendant, pendente lite, is bound by all that is done, whether a party by name or not. Ex parte Railroad Co., 95 U. S. 221, 226, 24 L. Ed. 355. It was open to Russell & Co., S. en C., to defend the cause in the name of Fortuna Estates, or to become a party and assume the burden of the litigation in its name.

Then, again, the mere addition of Russell & Co., whether it was a legal entity domiciled in Porto Rico or not, would not oust the federal court of jurisdiction, jurisdiction of the cause having once attached. Stewart v. Dunham, 115 U. S. 61, 5 Sup. Ct. 1163, 29 L. Ed. 329. See also Hardenbergh v. Ray, 151 U. S. 112, 118, 14 Sup. Ct. 305, 38 L. Ed. 93, which seems to conclude the point here under discussion.

[3] We are also of the opinion that, where the jurisdiction of a federal court over a suit brought against a partnership depends upon diversity of citizenship, the question is to be determined by the citizenship of its members, whether under the law of the place of its origin it is regarded as an entity and may sue or be sued in its partnership name. Chapman v. Barney, 129 U. S. 677, 682, 9 Sup. Ct. 426, 32 L. Ed. 800; Great Southern Fire Proof Hotel Co. v. Jones, 177 U. S. 449, 455, 20 Sup. Ct. 690, 44 L. Ed. 842; McLaughlin Bros. v. Halliowell, 228 U. S. 278, 33 Sup. Ct. 465, 57 L. Ed. 835; Bruett & Co. v. Austin Drainage Excavator Co. (C. C.) 174 Fed. 668; Columbia Digger Co. v. Rector (D. C.) 215 Fed. 618; Empire Rice Mill Co. v. Neumond (La. D. C.) 199 Fed. 800; Moon on Removal of Causes, § 128, p. 331.

Now as to the merits of the cause: The disputed territory, as described in the plaintiff's complaint, was bounded on the south by the sea, and there was included within the territory described a lagoon which, the evidence disclosed, was subject to the ebb and flow of the tide, and the defendants' counsel in open court disclaimed any title or adverse holding to land covered by the lagoon or as affected by the ebb and flow of the tide. The result was that the territory in dispute, according to the complaint and disclaimer, was bounded southerly by the shore of this lagoon or arm of the sea and by the shore of the open sea.

The questions thus presented were: (1) Where was the shore of the sea located on the ground, on the open sea and the lagoon? and (2) was there any land described in the complaint that was actually located above and outside the limits of the seashore proper? The case, however, was tried on the theory that the description of the land in the complaint extended, not simply to the seashore proper, but to low tide.

The plaintiff took the position and introduced evidence tending to show that all the land described in the complaint was covered at high tide. The defendants' position was that a large part of the territory described in the complaint south of the north bound was not covered by the tide, that the plaintiff had shown no title to the land between the north bound and high tide, and that the defendants had acquired title to such land by prescription.

[4] The District Court charged the jury in substance that if the land in question was seashore, it belonged to the people of Porto Rico, who held it in trust for the public; that the seashore was land lying between "high tide, the highest regular tide and low tide"; that the defendants' ownership under their deed was bounded on the south by the seashore; that, if the land in controversy was covered by high tide, it was not acquired by the defendants under their deed; and that if the defendants obstructed its use by the public the plaintiff could recover. The court also instructed the jury that there was evidence that not all the land in controversy was covered by high tide, that some of it was above the tide; that, if this was so, the plaintiff must prove its case by showing "some definite title to such part"; that if the plaintiff made out a prima facie case, and the defendants set up a prescriptive right to the land, the defendants would have the burden of proving their prescriptive right.

On the question of prescription the jury were told that to acquire property by prescription the defendants and their predecessors in title must have had actual physical possession and control of it, openly and notoriously for 10 years prior to 1900, with good faith and a proper title.

It thus appears that the court and parties treated the description of the disputed territory set out in the complaint as extending to low-water mark.

It is evident that, under the instructions given, the jury must have found (1) that all the land described in the complaint was seashore and that the defendants were making no use of it inconsistent with the public use; or (2) that a part of it was flowed by the sea and that the defendants were making no use of that part inconsistent with the public use, and that, as to the balance, not flowed by the sea, the plaintiff had failed to make out its title or that the defendants had acquired title thereto by actual possession, open and notorious for 10 years prior to 1900, with good faith and a proper title.

The instruction of the court defining the seashore—as that land between high tide, the highest regular tide, and low tide—was correct, whether viewed from the standpoint of the common law or the civil law. United States v. Pacheco, 2 Wall. 587, 590 (17 L. Ed. 865). In that case Mr. Justice Field, in delivering the opinion of the court, said:

"By the common law, the shore of the sea, and, of course, of arms of the sea, is the land between ordinary high and low water mark, the land over which the daily tides ebb and flow. When, therefore, the sea, or a bay, is named as a boundary, the line of ordinary high-water mark is always intended where the common law prevails. * * * If reference be had to the rule of the civil law, because the bay is given as a boundary in the grant from the Mexican government, the result will be equally against the position of the appellants."

In view of the plaintiff's description of the disputed land in its complaint and the defendants' disclaimer of any right to or adverse use in land below high-water mark, the issue tried as to the land below high-water mark was fictitious, and, this being so, the plaintiff could not have been harmed either as to the instructions of the court bearing upon that issue or the finding of the jury.

But as the jury may have found that some of the land in dispute was not flowed by the tide and also that, as to such part, the plaintiff had failed to show title or that the defendants had acquired title to it by prescription for 10 years prior to 1900, it becomes necessary to consider the evidence bearing on the plaintiff's proof of title and perhaps the rulings of the court on the question of prescription.

The plaintiff's case was that the king of Spain acquired title to all the land in Porto Rico by discovery; that by the treaty of Paris, proclaimed April 11, 1899, the Spanish government transferred all its property in Porto Rico to the United States; and to show title in Porto Rico to the land in question whether located above or below high-water mark, it relied upon section 13 of the Act of Congress of April 12, 1900, known as the Foraker Act (Comp. St. § 3760), and upon section

8 of the Act of Congress of March 2, 1917, known as the Jones Bill (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3803cc).

Since the argument of the cause we have found an Act of Congress passed July 1, 1902 (32 Stat. at Large, p. 731), and an Act of the Legislature of Porto Rico of February 16, 1903 (section 1673 of the Revised Statutes and Codes of Porto Rico, p. 322), which also relate to the transfer of lands in Porto Rico by the United States to the government of Porto Rico. The Act of Congress of July 1, 1902 (Comp. St. § 3761), reads as follows:

"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, that the President be, and he is hereby, authorized to make, within one year after the approval of this act, such reservation of public lands and buildings belonging to the United States in the island of Porto Rico, for military, naval, light-house, marine hospital, post-offices, custom-houses, United States courts, and other public purposes, as he may deem necessary, and all the public lands and buildings, not including harbor areas and navigable streams and bodies of water and the submerged lands underlying the same, owned by the United States in said island and not so reserved be, and the same are hereby, granted to the government of Porto Rico, to be held or disposed of for the use and benefit of the people of said island: Provided, that said grant is upon the express condition that the government of Porto Rico, by proper authority, release to the United States any interest or claim it may have in or upon the lands or buildings reserved by the President under the provisions of this act: And provided further, that nothing herein contained shall be so construed as to affect any legal or equitable rights acquired by the government of Porto Rico or by any other party, under any contract, lease, or license made by the United States authorities prior to the first day of May, nineteen hundred."

The important provision of the Act of Porto Rico of February 16, 1903, is section 4 (section 1673 of the Revised Statutes and Codes of Porto Rico, p. 322), which reads as follows:

"Sec. 4. That the Governor of Porto Rico be and he is hereby authorized in the name of the people of Porto Rico to release any interest or claim that the people of Porto Rico may now have or may hereafter acquire in and upon any lands or buildings belonging to the United States in the island of Porto Rico which may be reserved by the President of the United States for public uses under and by virtue of the power vested in him under the terms of an act of the Congress of the United States entitled 'An act authorizing the President to reserve public lands and buildings in the island of Porto Rico for public uses and granting other public lands and buildings to the Government of Porto Rico, and for other purposes,' approved July first, nineteen hundred and two."

By the Act of July 1, 1902, "all the public lands and buildings" (not including harbor areas and navigable streams and bodies of water and the submerged lands underlying the same), owned by the United States in said island and not reserved by the President within one year after the passage of the act, were to pass to the government of Porto Rico on its releasing to the United States any interest or claim it may have had in or upon the lands or buildings reserved by the President under the provisions of the act.

By the act of 1903 the government of Porto Rico authorized its governor to release any interest it might have in the lands reserved by the President. While it appears that the reserved lands do not include those here in dispute, there is nothing in the record which shows that

the Governor of Porto Rico released to the United States the interest his government may have had in the reserved lands.. I am, therefore, of the opinion that—if it be assumed that it could be found from the treaty that Spain ceded to the United States all the property it then owned in its public or private right, and that it then owned in its private right the land in dispute located above high-water mark, and if it be further assumed that, under the provisions of the three acts of Congress and the act of Porto Rico (judicial notice being taken of them all), the United States transferred to the government of Porto Rico such title and control of the property ceded to it by Spain as it held in its public right (lands devoted to public purposes, including the seashore)—the evidence does not warrant the conclusion that the federal government parted with its title to lands held in its private right located above high-water mark and not devoted to public uses. I entertain this opinion for the reason that the plaintiff failed to introduce any evidence to prove that the Governor of Porto Rico, under the act of 1903, released to the United States the interest, if any, his government had in the lands reserved by the President. My associates do not agree to this. They think that the evidence was sufficient to warrant a finding that the title passed from the United States to Porto Rico without specific proof that the Governor released any right or claim Porto Rico had in the lands reserved; that the act he was authorized to perform under the statute of 1903 was ministerial in nature and that he is to be presumed to have complied with its provisions.

[5] Was there evidence in the case from which it could be found that the defendants had acquired title to the land by prescription, and was the ruling on this question correct?

The evidence shows that dominion title to the lands in question was recorded in the registry of property in the names of the defendants and of their predecessors in title as far back as 1842; and there was evidence of actual, open and notorious possession under this record title from 1880, if not from an earlier date, down to the bringing of the suit. Under the Spanish Civil Code, art. 1957, which became operative in Porto Rico, July 31, 1889, prescriptive title to land could be acquired by possession for 10 years with good faith and with a proper title. Under this section of the Code, on the evidence submitted, the defendants would have acquired title by prescription on July 31, 1899, provided nothing intervened to prevent the running of the statute, for they had title by deed from one in possession under a dominion title, and their possession was in good faith. But the plaintiff contends that, inasmuch as the United States acquired its title by the treaty with Spain, proclaimed April 11, 1899, the prescriptive period was interrupted before the 10 years had elapsed, as prescription will not run against the United States. The defendants' answer to this is that the prescriptive period did not cease to run upon the cession by Spain to the United States; that, while Porto Rico was, by order of the President, under military control and occupation, a general order was issued November 4, 1898, continuing all laws in Porto Rico theretofore in force compatible with the military government; that, by section 8 of the Foraker Act of 1900 (Comp. St. § 3755), the laws and ordinances

of Porto Rico were further continued in force; and that, as section 1957 was continued in force and unmodified until the Political Code of Porto Rico was adopted March 1, 1902 (section 9), the period of prescription was not broken and the defendants' title became good at the expiration of 10 years from July 31, 1889; that the United States, by continuing section 1957 in force, sanctioned the acquisition of a prescriptive title against it.

The court below instructed the jury upon this question in accordance with the defendants' contention, and we fail to see wherein the instruction was not correct. We do not think that Crespin v. United States, 168 U. S. 208, 18 Sup. Ct. 53, 42 L. Ed. 438, and Hayes v. United States, 170 U. S. 637, 18 Sup. Ct. 735, 42 L. Ed. 1174, cited by plaintiff, are applicable, as in those cases the court, in reaching its conclusion, was limited by the language of the act creating the Court of Private Land Claims, while here we have the adoption of the provision of the Spanish Code continuing the right of prescription.

The plaintiff also requested the court to charge the jury in substance that the Spanish government originally owned all the land in Porto Rico, and that, if a record of a piece of land in the registry of property failed to show that Spain, during its régime, had parted with its title, the record would disclose a defect apparent on its face and the defendants would not be third parties under the mortgage law who had purchased in good faith and without notice of any defect in their title.

The question whether the defendants were third parties under the mortgage law was not submitted to the jury and we fail to see wherein the plaintiff could have been harmed by the refusal of the court to give its request as to this matter, if it contained a correct statement of the law—a question we do not find it necessary to decide.

The judgment of the District Court is affirmed, with costs to the defendants in error.