## PEOPLE OF PORTO RICO v. LIVINGSTON.
### No. 2473.

Circuit Court of Appeals. First Circuit.
Feb. 19, 1931.

ANDERSON, Circuit Judge, dissenting.

William C. Rigby, of Washington, D. C. (James R. Beverley, Atty. Gen., of Porto Rico, Grant T. Trent and Edward A. Kreger, both of Washington, D. C., on the brief), for the People of Porto Rico.

Carroll G. Walter, of New York City, and Henri Brown, of San Juan, Porto Rico, for appellee.

Before BINGHAM, ANDERSON, and WILSON, Circuit Judges.

WILSON, Circuit Judge.

· This action was begun in the insular court of Porto Rico as an action of revindication or ejectment to recover land alleged to belong to the people of Porto Rico. The defendant filed a motion to transfer the action to the federal District Court on the ground of diversity of citizenship, which was granted. It was opposed by the plaintiff, who contended that the District Court had no jurisdiction when the people of Porto Rico was one of the parties, and also contended that Clara Livingston was a citizen and resident of Porto Rico. After removal, the plaintiff filed a motion to remand the case to the insular court based on the above grounds, which was denied.

The motion to remand was properly denied. The evidence warranted, and the court found, that Miss Livingston was domiciled in New York; and this court has previously held in Porto Rico v. Fortuna Estates, 279 F. 500, 503, 504, that, where Porto Rico is a par-

ty, and the other party is a citizen and domiciled in a state or territory of the United States, a case may be transferred from the insular court to the federal court.

Upon the denial of the motion to remand, the defendant filed her answer, and, under section 274b of the Judicial Code (28 USCA § 398), set up as an equitable defense to the action that her predecessors in title were in open and uninterrupted possession of the lands in dispute for more than ten years prior to 1902 under a just or proper title, acquired by purchase, in good faith, and without any notice in the registry of property of any defects or claims against the property by any other person; that her father, by purchase in 1904, and she by inheritance in 1923-24, acquired a dominion title to said lands; that since 1902 she and her predecessors in title have continued in full and uninterrupted possession of said lands; that they have paid taxes thereon and spent large sums of money in improving the property; that in 1924 the Commissioner of the Interior, in behalf of the plaintiff, caused to be inscribed in the registry of property a claim of possessory title to said lands based upon the false statement that the plaintiff had been in open and uninterrupted possession thereof since 1902; that the plaintiff has repeatedly set up a claim to the portion of her land described in the complaint, and has attempted to get possession by threats and stealth, wherefore she prayed that the inscription by the plaintiff of an alleged possessory title be declared null and void and be canceled; and, further, that the plaintiff be enjoined from asserting any title to the land described in its complaint, and be further enjoined from interfering with the possession of the defendant.

To this answer the plaintiff filed a replication, and went to trial on the equitable issues raised; but, when evidence of title was offered, it contended that the court sitting in equity could not try the title to the land, and that the plaintiff on this issue was entitled to a trial by jury. The District Court refused to so rule, and, after the close of the evidence, without making any special findings of fact, found generally that the defendant had proven all the facts essential to sustain her plea for affirmative relief, as well as all the other equitable defenses pleaded, which must be held to include the following facts: That in 1881 one Jacinto Lopez registered a possessory title to a large tract of land described as the Hacienda San Antonio, which included the lands now in dispute; that, upon the partition of his estate in 1886, follow-

ing his death, a part of the Hacienda San Antonio situated in the municipality of Dorado, consisting of 2,760.41 cuerdas, was adjudicated to his widow, to whom, or to her husband's estate, it was thereafter taxed by the municipality of Dorado; that, by reason of a failure to pay the taxes assessed thereon, one Pablo Ubarri in February, 1888, and March, 1889, purchased in good faith at public sales from the municipality of Dorado, and in part required by judicial proceedings, the entire 2,760.41 cuerdas set off to the widow, which included the lands in dispute; and that he and his successors in title, including the defendant, were in open and continuous possession from March, 1889, under a claim of right, to the date of the writ, and thereupon the District Court held that the defendant had a good dominion title to the lands, and ordered the possessory inscription of the plaintiff canceled as null and void, and enjoined the plaintiff from further interfering with the defendant's possession.

We think the decision of the District Court must be affirmed.

Before proceeding to consider the questions of pleading and procedure under section 274b of the Judicial Code, it may be well to first review the evidence as to the title to the lands, as we think on the record, under the Mortgage Law of Porto Rico as construed by the Supreme Court of Porto Rico in Porto Rico v. Riera, 27 P. R. R. 1, and Teillard v. Teillard, 18 P. R. R. 546, a dominion title to the lands in dispute is made out by the defendant, and her right in equity to have her title quieted and any cloud thereon removed is clear.

According to the record, some time prior to 1864 one Jacinto Lopez acquired a large tract of land on the Island of Porto Rico situated partly in what is now the town or municipality of Dorado, and partly in the municipality of Vega Alta, adjoining Dorado on the west. One hundred acres of this land, including part of a small lagoon, known as Mata Redonda, was purchased by Lopez of one Manuel Canino in 1848, who had it by a concession from the Spanish government in 1847.

Jacinto Lopez, Sr., died about 1864, and his son, Jacinto Lopez, acquired the land owned by his father by inheritance, and additional adjoining lands by purchase, all of which, following the extension of the Mortgage Law of Spain to Porto Rico in 1880, he caused in 1881 to be recorded in registry of property at San Juan as finca, or parcel of

land, No. 27, of which 4,237 cuerdas were in the jurisdiction of Dorado, and was known as the Hacienda San Antonio, and which was bounded on the west by the dividing line between the municipality of Dorado and Vega Alta, and on the north by the sea. This land clearly included the 355 cuerdas in dispute in this action, which are situated in the northwest corner of the municipality of Dorado, and are bounded on the north by the sea and on the west by the dividing line between Dorado and Vega Alta.

This inscription, however, was of a possessory title only, as it is termed under the Mortgage Law of Porto Rico, to obtain which the law required the abutting owners to appear before a local official and acknowledge that the party seeking to inscribe such a title was then in possession of the land described claiming as owner. Maldonado v. Ramos, 24 Porto Rico R. 278, 280; Ochoa v. Hernandez, 230 U. S. 139–148, 33 S. Ct. 1033, 1036, 57 L. Ed. 1427. In the latter case the court said: "The entry of a possessory title in his name was in effect a judicial certificate declaring him to be entitled to the possession, but without prejudice to third parties who might show a better right to it. It gave him no title as against them, but conferred a prima facie legitimacy upon his profession, being 'provisional and presumptive evidence of ownership.'"

Following the death of Jacinto Lopez, Jr., some time prior to 1886, these lands were divided among his heirs and his widow, his widow receiving on a partition of his estate 2,-760.41 cuerdas of the Hacienda San Antonio, and registered as finca 99, which thereafter was taxed to her or to the estate of Jacinto Lopez, and in 1888 and 1889 was segregated into eight parcels, six of which were sold by the municipality of Dorado for failure to pay the taxes, and were bought by Pablo Ubarri at a public sale, and by the terms of the orders of sale possession was directed to be delivered to him; the other two parcels being acquired by Ubarri as the result of judicial proceedings. In 1891 Ubarri caused the several parcels thus acquired, together with the remainder of the Hacienda San Antonio, which he acquired of the children of Lopez, to be grouped together and again registered in the registry of property as a single finca, numbered 172, which was located in the municipality of Dorado, and is described as bounded on the north by the sea, and on the west by the Hacienda San Vicente, the Hacienda San Vicente being located in the adjoining municipality of Vega Alta, and had for its easterly boundary the dividing line between Vega Alta and Dorado, and originally extended from the sea on the north to the Hacienda Ceiba, which joined the Hacienda San Vicente on the south and below the lands here in dispute.

The first and northerly parcel segregated from finca 99, when sold for taxes, was described in the order of sale and deed to Ubarri as bounded on the north by the sea and on the west by the Hacienda San Vicente; and each of the other seven parcels segregated from finca 99 and acquired by Ubarri is bounded on the west by the Hacienda San Vicente, and on the east by land described in the adjudication to the widow as her eastern boundary. Since the total cuerdas of the eight parcels acquired by Ubarri by these tax deeds and judicial proceedings exactly make up the total 2,760.41 cuerdas contained in finca 99, adjudicated to the widow, the clear inference is that Ubarri thus acquired the entire parcel set off to her, which is supported by the fair construction of the inscriptions in the registry contained in the record.

We think the District Court, therefore, was amply warranted from all the evidence in finding that the land thus acquired by Ubarri covered the entire parcel adjudicated to the widow, which included the lands in dispute; that he took possession in 1888 and 1889, caused a fence to be built along the western boundary between Dorado and Vega Alta, and cut wood thereon and used them for pasturage. There is also evidence in the record that, after a railroad was built in 1887 through the land set off to the widow, there was a fence, at least along the northerly boundary of the railroad right of way, which is now the southern boundary of the Livingston property.

Upon the death of Ubarri in 1894, the Hacienda San Antonio descended to his heirs, and the northerly part, at least, was acquired by a daughter, Modesta, and a son, Pablo Ubarri. In 1897 they divided the land thus acquired, and segregated therefrom a finca, numbered 204, composed of 2,039+ cuerdas, which was adjudicated to Modesta, and which included the lands in dispute, since it was bounded on the north by the sea and on the west by Central San Vicente. In 1903 Modesta conveyed this finca, 204, to two men, by name Jose Balado and Jose Hernandez, who in 1904 conveyed that portion lying north of the railroad above referred to, consisting of 1,620 cuerdas (which also included the lands in dispute, being bounded on the north by the sea and west by the "Central San Vicente,"

and land of one Eloy Hernandez, which was originally a part of the Hacienda or Central San Vicente), to the defendant's father, Dr. Livingston, and several associates, whose interests Dr. Livingston later in 1905 and 1906 purchased, and so acquired the record title of the 1,620 cuerdas now known as Hacienda, or plantation, La Sardinera. Dr. Livingston continued to fence and occupy the entire land thus acquired by him, to the line between Dorado and Vega Alta, and paid taxes on the entire property until his death in 1922; and the defendant has since continued to occupy the same and to pay taxes thereon.

Upon these facts, under the Mortgage Law of Spain and Porto Rico, as interpreted in Porto Rico v. Riera, supra, and section 1858 of the Civil Code, the defendant clearly established a dominion title to the lands in dispute. According to that case, a purchaser has to look no further than the records in the registry of property, which, when Dr. Livingston bought, disclosed only the facts that in 1881 Jacinto Lopez, Jr., registered a possessory title of the entire tract of land of more than 4,000 cuerdas known as Hacienda San Antonio; that he also registered a dominion title of the 100 cuerdas obtained from Canino; that upon his death, in a division of his estate, 2,760.41 cuerdas, which included the lands in dispute, were adjudged to his widow, Concepcion Laborde y Rapp, and were taxed to her or to the estate of her husband by the municipality of Dorado; that she failed to pay the taxes thereon; and that in 1888 and 1889 one Pablo Ubarri by purchase from the municipality of Dorado at public sale and under tax deeds or by judicial proceedings brought against the widow or the estate of Jacinto Lopez, acquired the entire 2,760.41 cuerdas, which were bounded on the north by the sea and on the west by the Hacienda San Vicente. There was nothing in the registry to indicate to Dr. Livingston in 1904 that the possession of Jacinto Lopez or his successors in title, and especially that of Pablo Ubarri, had ever been interrupted or questioned.

■■ Where one in good faith obtains a deed conveying land from one who has authority to sell, no invalidity appearing in the deed or the registry, and the purchaser having no knowledge of any defects, he acquires a "just" or "proper title," which is defined in section 1853 of the Civil Code as a title "which legally suffices to transfer the ownership or property right, the prescription of which is in question." See Porto Rico v. Riera, supra; Teillard v. Teillard, 18 Porto Rico R. 546; Tex. & Pac. Ry. v. Smith, 159 U.

S. 66, 69, 15 S. Ct. 994, 40 L. Ed. 77; Pike v. Evans, 94 U. S. 6, 8, 9, 24 L. Ed. 40; Davis v. Gaines, 104 U. S. 386, 400, 26 L. Ed. 757. There is no evidence that Ubarri did not acquire this parcel, or finca 99, in good faith. Bad faith must be proven. Davis v. Gaines, supra.

■ A tax deed will convey an estate in fee, if not redeemed, where the statutory formalities are complied with. Gonzalo et al. v. Jimenez et al., 30 Porto Rico R. 807, 809. Therefore a tax deed from a municipality having authority to sell and convey lands to secure payment of taxes, and no invalidating defects appearing in the deed, will convey a "just" or "proper title" within the meaning of section 1853 of the Civil Code on which prescription may run. With a "just" or "proper title," lands are prescribed by section 1858 of the Civil Code after ten years of possession. Ochoa v. Hernandez, supra; Fernandez & Bros. v. Allyon y Ojeda, 266 U. S. 144, 45 S. Ct. 52, 69 L. Ed. 209.

■ Therefore, Pablo Ubarri, having received his title by judicial proceedings or by deeds from a municipality authorized to sell at public sale and convey lands for failure to pay taxes, and without notice of any irregularity or defect, acquired a "just" or "proper title" thereto, and he and his heirs, after ten years of uninterrupted and open possession, acquired dominion title. In People of Porto Rico v. Fortuna Estates, 279 F. 500, this court held that prescription against the government, begun under the Spanish law, by virtue of an order of the President in 1898, when Porto Rico was under military law, might continue as against the government until 1902 when the Political Code for Porto Rico was adopted, which prohibited prescription as against the People of Porto Rico; hence, if Ubarri took possession of finca 99 at any time prior to 1892, his possession, which the District Court must have found was open and uninterrupted, ripened into a dominion title prior to 1902.

■ It is urged by the plaintiff, however, that, prior to the registry of the possessory title to the finca, registered as No. 27 in 1881 by Jacinto Lopez, proceedings were instituted before the Governor General of Porto Rico to cancel the grant of 100 cuerdas obtained by Lopez from Canino and to recover also 255 cuerdas lying to the west of the Canino grant and between it and the dividing line between Dorado and Vega Alta, which it was claimed were public lands, and to which Lopez had no title, and which are the lands here in dispute;

that the Governor General sustained this claim, and canceled the Canino grant, and ordered possession to be taken of the 355 cuerdas by the civil guards in behalf of Spain, which was done; that, while Lopez appealed to the administrative claims council, an insular court, which in 1884 reversed the order of the Governor General, the government appealed from this decision to the highest court in Spain, where, after the case had slumbered at Madrid for five years, and Lopez, who in the meantime had died, failing to appear, was defaulted, and in 1889 the judgment of the insular court was reversed and judgment given for the Spanish government.

No cautionary notice, however, of these proceedings was ever filed in the registry of property at San Juan, nor has the Spanish government or that of Porto Rico taken any action to put into effect this judgment until these proceedings were brought in 1927.

Copies of the proceedings in the Spanish courts were offered in evidence by the plaintiff for the purpose of showing that the title to these lands is now in the People of Porto Rico by virtue of the treaty between Spain and the United States, and by grant from the United States to the People at Porto Rico. These documents were excluded by the District Court on the ground that, under articles 23 and 389 of the Mortgage Law, never having been recorded in the registry of property, nor any cautionary notice of the proceedings against Lopez having been filed therein, they could not be introduced to prejudice the rights of a third person who was not a party to the proceedings.

It is claimed that article 2 of the Mortgage Law does not provide for the registry of judgments except in one specific instance, or the recording of lands in the name of the government.

It may be that public lands acquired by the government by conquest or treaty were not required to be registered in the registry of property under the Mortgage Law of Spain, and regulations for its execution, see article 25 of the regulations; but, where the title of land once appears in the registry of property in the name of an individual, and the government afterward acquires it by purchase or by judicial proceedings, the same rule must apply as in case of an individual. An examination of the entire Mortgage Law and the regulations for its enforcement clearly indicates that, in order to protect one against innocent purchasers for value in good faith, it is necessary to record in the registry of property all instruments under which rights in real property are acquired, conveyed, modified, or extinguished, including judgments and cautionary notices of all judicial proceedings for the recovery of lands or the possession thereof (Romeu v. Todd, 206 U. S. 358, 27 S. Ct. 724, 51 L. Ed. 1093) ; since under the Mortgage Law no purchaser is required to look beyond the registry for invalidating defects (Porto Rico v. Riera, supra; Fernandez & Bros. v. Allyon y Ojeda, supra).

Under articles 23 and 389 of the Mortgage Law, no cautionary notice of the proceedings against Lopez having been filed in the registry of property at San Juan in compliance with article 42, or any inscription made therein of the final judgment of the Spanish court, it cannot be permitted to prejudice the rights of the defendant or be introduced in evidence in any proceeding affecting the title of the defendant, who is a third person within the meaning of the Mortgage Law as defined in article 27 thereof, which provides: "For the purposes of this law, a third person shall be considered one who has not been a party to the recorded instrument"; and article 23 of the Mortgage Law provides that the instruments mentioned in article 2, if not duly recorded, "shall not prejudice the rights of third persons." See, also, Teillard v. Teillard and Maldonado v. Ramos, supra.

Neither was it admissible under article 389 as corroborative of the possessory title recorded by the plaintiff in 1924, especially since it is admitted by the plaintiff in its pleadings that the defendant is in possession, and the evidence discloses beyond question that her family has been in exclusive possession since 1904; nor were they offered for that purpose, and were properly excluded, when offered merely to show title in the plaintiff, as under Porto Rico v. Riera, supra, without any cautionary notice of the proceedings or any record of the judgments appearing in the registry of property, they were without effect as to a purchaser in good faith.

Neither was there prejudicial error in excluding the record of the proceedings before the Governor General on the issue of possession of the disputed lands from 1889 to 1902. This document, when offered, was offered, as the record shows, to prove possession by the Spanish government and to rebut the evidence of the defendant as to possession by Pablo Ubarri and his heirs, from the years 1889 and 1902. As an unrecorded instrument and without any cautionary notices of its pendency being filed in the regis-

try, it was no more admissible under article 389 of the Mortgage Law to affect the rights of this defendant than the judgment of the court of Spain. The defendant, as to this document, is clearly a third person as defined in article 27 of the Mortgage Law.

It is now urged, however, that the document offered contains an admission by Jacinto Lopez that possession was turned over to the government in 1883, but the plaintiff's counsel did not inform the trial court of this fact, or offer it on this ground. We cannot assume that the court in excluding the document ruled on a point not presented to him, and hence it is not involved in the plaintiff's exception.

Even if we could consider this evidence on an appeal in equity, we do not think it could have changed the findings of the court below. The possession claimed to have been taken by the civil guards was in 1883. The order of the Governor General was reversed by the insular court in 1884. The lands were set off and adjudicated to the widow of Jacinto Lopez in 1886. They were thereafter taxed to her or to the estate of Jacinto Lopez. The presumption from these facts alone, even if it were not substantiated by other evidence, is almost conclusive that she must have been in possession of finca 99 from 1884, or at least from the time set off and adjudicated to her as a part of her husband's estate in 1886 to the time it was sold for taxes and possession ordered to be delivered to Ubarri by the municipality of Dorado in 1888 and 1889.

The witnesses for the plaintiff as to occupation by the civil guards after the reversal of the order of the Governor General in 1884 is so vague and supplied largely by one Pedro Lopez—whose testimony the court expressly found was so biased as to be of no weight—and his relatives and friends, that the court, after consideration of the evidence offered by the defendant, evidently regarded it as of no value; and even Lopez went no further than to say that the civil guards were there until Pablo Ubarri acquired the rest of the property, or in 1889. The interest of this Pedro Lopez in this suit was apparent from the record, due, no doubt, to the fact that he was removed from the office of Mayor of Dorado at the instigation of Dr. Livingston for some misfeasance in office. It was he who accompanied the engineer for the government and pointed out the lands the government now claims, after sleeping on its alleged rights for more than thirty years, assessing and collecting taxes thereon, and permitting the defend-

ant and her father to expend large sums of money in improving these lands and adding to their value; lands which, according to the record, were worth in 1847 only 2 pesos per acre, are now, in part at least, through improvements made by this defendant and her predecessors in title, worth $75 per acre.

We now come to the objection that a court of equity cannot pass on the title under the defendant's answer. If the defendant has a dominion title to these lands, and an individual should set up a claim thereto and seek to obtain possession under its claim by threats and stealth, and should register an inscription in the registry of property of a possessory title, and by a writ of ejectment set up a claim of dominion title and seek to obtain possession, the defendant, under section 282 of the Code of Civil Procedure of Porto Rico, clearly could maintain a bill in equity to quiet her title and remove a cloud therefrom (Lawson v. Mining Co., 207 U. S. 1, 28 S. Ct. 15, 52 L. Ed. 65)—where a similarly worded statute was under consideration—and enjoin the plaintiff (if a private party) from prosecuting the ejectment suit (Wehrman v. Conklin, 155 U. S. 314, 325, 15 S. Ct. 129, 39 L. Ed. 167).

This defendant has no complete and adequate remedy at law. Ruckman v. Cory, 129 U. S. 387, 389, 9 S. Ct. 316, 32 L. Ed. 728. Even if she could successfully defend the ejectment suit, a court of law could not order the possessory title of the plaintiff canceled on the records of the registry. No affirmative relief can be given in a suit at law. Commodores Point Terminal Co. v. Hudnall (D. C.) 283 F. 150.

It is a settled principle of equity jurisprudence that, if the remedy at law be doubtful, a court of equity will not decline cognizance of the suit, where equity can give relief. A complainant in equity ought not to be compelled to speculate upon the chances of his obtaining relief at law. The remedy at law must be clear, adequate, and direct. Davis v. Wakelee, 156 U. S. 680, 688, 15 S. Ct. 555, 39 L. Ed. 578; Sullivan Timber Co. v. Mobile (C. C.) 110 F. 186, 198.

Prior to the enactment of the state laws, such as are construed in Holland v. Challen, 110 U. S. 15, 25, 26, 3 S. Ct. 495, 501, 28 L. Ed. 52, Wehrman v. Conklin, 155 U. S. 314, 325, 15 S. Ct. 129, 39 L. Ed. 167, and Lawson v. Mining Co., 207 U. S. 1, 28 S. Ct. 15, 52 L. Ed. 65, and section 282 of the Code of Civil Procedure of Porto Rico, it is true a person in possession and claiming title could not

720

bring a bill in equity to quiet his title without it first being established at law; but, since a court sitting in equity under these acts is now authorized to establish an interest in real estate, where the party claiming title is in possession, without his title being first established at law, the equity court may pass on the title and settle the rights of the parties in one proceeding, which, if the title was litigated at law in a suit of ejectment, might require additional proceedings in equity to quiet the title or remove the cloud.

 If, then, the defendant now has the right, in case her claim of title is disputed, to bring a bill in equity under section 282 of the Code of Civil Procedure to quiet her title and remove a cloud, without the title being first established at law, section 274b of the Judicial Code, which was enacted to prevent circuity of action, clearly permits the defendant to set up in her answer to the plaintiff's action of ejectment what in effect is a cross-action to quiet her title and remove the cloud. The case then stands as though an independent suit in equity was brought and the action at law enjoined. The court will first settle all equitable issues between the parties. United States v. Napoleon (C. C. A.) 296 F. 811; Liberty Oil Co. v. Condon Bank, 260 U. S. 235, 43 S. Ct. 118, 120, 67 L. Ed. 232. The court said in the last-cited case, the "answer and cross-petition became an equitable defense and a prayer for affirmative equitable relief in the nature of a bill for interpleader."

An answer to the plaintiff's ejectment suit in the form of a cross-action setting up an equitable defense is the only remedy the defendant has by which she can obtain affirmative relief under the circumstances of this case. Being in possession, she could not bring an action of revindication even against an individual; and, as Porto Rico cannot be sued by an individual without its consent, Porto Rico v. Rosaly, 227 U. S. 270, 33 S. Ct. 352, 57 L. Ed. 507, she could not bring an independent bill in equity against it and obtain the affirmative relief to which she is entitled; but, by virtue of section 274b of the Judicial Code, she is permitted in an answer to a suit at law by the government to set up an equitable defense calling for affirmative relief, and, if sustained, and it constitutes a defense to the suit at law, have the prosecution of the suit at law permanently enjoined.

In Liberty Oil Co. v. Condon Bank, supra, where the defendant set up in its answer a cross-bill of interpleader, the Supreme Court said: "Where an equitable defense is interposed to a suit at law, the equitable issue raised should first be disposed of as in a court in equity, and then, if an issue at law remains, it is triable to a jury. * * * The equitable defense makes the issue equitable, and it is to be tried to the judge as a chancellor. The right of trial by jury is preserved exactly as it was at common law. The same order is preserved as under the system of separate courts. *If a defendant at law had an equitable defense, he resorted to a bill in equity to enjoin the suit at law, until he could make his equitable defense effective by a hearing before the chancellor. The hearing on that bill was before the chancellor, and not before a jury, and, if the prayer of the bill was granted, the injunction against the suit at law was made perpetual, and no jury trial ensued. If the injunction was denied, the suit at law proceeded to verdict and judgment. This was the practice in the courts of law and chancery in England when our Constitution and the Seventh Amendment were adopted, and it is in the light of such practice that the Seventh Amendment is to be construed.*" (Italics supplied.)

 Since, under a bill to quiet title and remove a cloud, the complainant must allege and prove a better title than any shown by the defendant to entitle him to the relief prayed for, it necessarily involves proof of complainant's title and to the chancellor. Frost v. Spitley, 121 U. S. 552, 556, 7 S. Ct. 1129, 30 L. Ed. 1010. The District Court, therefore, properly held the issue of title was involved as a ground for the equitable relief prayed for, and which under the cases above cited must first be heard by the court sitting as in equity, and, being settled in favor of the defendant, there was no issue left in this instance to be tried in the ejectment suit.

 Again, under section 274b, if a defendant files such a cross-petition or defense based on grounds within the jurisdiction of a court of equity and applies for affirmative relief, the plaintiff must file a replication.

If a plaintiff files a replication, he thereby acknowledges the propriety of the cross-petition in equity, and the case is transferred to the equity side. If he claims the defendant has disclosed no ground for equitable relief in the answer, but on the contrary has an adequate remedy at law, he should take some proper action by demurrer or motion to have the pleadings in equity stricken out and the case left on the law side. If, however, he files a replication and goes to trial on the equity issues without objection, he must be held to waive his rights at law, until any issues in equity are disposed of. Am. Mills Co. v. Am. Surety Co., 260 U. S. 360, 363, 43 S. Ct. 149,

67 L. Ed. 306. This the plaintiff did in this case. Following the filing of the defendant's answer setting up her ground of defense, and praying for relief in equity, the plaintiff, without objection so far as the record shows, filed a replication, and the case was set for hearing before the court on the equity side. The plaintiff then filed a motion for a jury to try the issues of fact in the equitable defense, which was a matter discretionary with the court, and was refused. The hearing was then begun on the equitable issues. During the hearing objection was raised to the admission of evidence bearing on the question of title on the ground that the plaintiff was entitled to have a jury pass on that issue, but this objection was too late.

In Camp v. Boyd, 229 U. S. 530, 552, 33 S. Ct. 785, 793, 57 L. Ed. 1317, the court said: "One of the duties of such a court is to prevent a multiplicity of suits, and to this end a court of equity, if obliged to take cognizance of a cause for any purpose, will ordinarily retain it for all purposes, even though this requires it to determine purely legal rights that otherwise would not be within the range of its authority." This case is a complete answer to any suggestion that the court of equity will only pass on equitable rights when it once takes jurisdiction. Once having assumed jurisdiction, it will determine all rights, legal or equitable, which are necessary to settle the equitable issues.

To the same effect is the language of the court in McGowan v. Parish, 237 U. S. 285, 296, 35 S. Ct. 543, 548, 59 L. Ed. 955: "The simple issue that remained was, of course, of such a nature that it would have been the proper subject of an action at law had it not originally been bound up with questions appropriate for decision by an equitable tribunal. But 'a court of equity ought to do justice completely, and not by halves'; and a cause once properly in a court of equity for any purpose will ordinarily be retained for all purposes, even though the court is thereby called upon to determine legal rights that otherwise would not be within the range of its authority."

In the Holland v. Challen Case, "It is not an objection to the jurisdiction of equity that legal questions are presented for consideration which might also arise in a court of law. If the controversy be one in which a court of equity only can afford the relief prayed for, its jurisdiction is unaffected by the character of the questions involved."

Also see The Salton Sea Cases (C. C. A.) 172 F. 792.

This principle is too well established to require further citation. Pomeroy, Eq. Juris. vol. 1 (4th Ed.) § 181.

To prevent the equity court from taking jurisdiction by reason of section 267 of the Judicial Code (28 USCA § 384), there must not only be a remedy at law, but it must be as "plain and adequate, or in other words, as practical and efficient to the ends of justice and its prompt administration, as the remedy in equity." Boyce v. Grundy, 3 Pet. 210, 215, 7 L. Ed. 655; United States v. Union Pac. Ry., 160 U. S. 1, 51, 16 S. Ct. 190, 40 L. Ed. 319. The remedy available in equity to both parties to this cause is so much more direct and adequate and practical that the grounds necessary for proceedings at law upon the theory that the defendant had an adequate remedy by defending the law action are lacking.

A remark by the court in Oelrichs v. Spain, 15 Wall. 211, 228, 21 L. Ed. 43, is peculiarly applicable to the case at bar: "The direct proceeding in equity will save time, expense, and a multiplicity of suits, and settle finally the rights of all concerned in one litigation."

One other assignment of error only needs consideration. The admission of the letter of an attorney who examined the title for Dr. Livingston and his associates, and expressed an opinion therein on its validity, might have been prejudicial if the case had been tried before a jury, but there is nothing in the record to indicate that it in any way entered into the judgment of the chancellor other than on the question of good faith, if at all, which was a material issue in the case, and on which evidence of the fact that the purchasers had no notice of any defects in the title was admissible. It is not shown that any prejudice resulted from the admission of this testimony.

It is a significant fact as bearing on the good faith of the government in these proceedings that no action was taken to establish any title in the government until after Dr. Livingston's death and the lands came into the possession of a young girl in her twenties, when their engineer, accompanied by this man Pedro Lopez, attempted to secure possession by threats and stealth, knowing that, if they obtained possession, the defendant was helpless to re-establish her possession by any judicial proceedings against the government, only to find that the new owner was quite capable of protecting her rights.

 The District Court also grounded its equity jurisdiction on laches and estoppel, and there is much to sustain its ruling both on the facts and law; laches being generally held to be a defense cognizable only in a court of equity. Korsstrom v. Barnes (C. C.) 156 F. 280; United States Fid. & Guar. Co. v. United States ex rel. Bartlett (C. C. A.) 189 F. 339; Wehrman v. Conklin, 155 U. S. 314, 325, 15 S. Ct. 129, 39 L. Ed. 167; Thorpe v. Wm. Filene's Sons Co. (D. C.) 40 F.(2d) 269; Simpkins Federal Practice (Rev. Ed.) p. 42. The equity jurisdiction of the court, however, is clearly established by the answer setting up in substance a cross-bill to quiet title and remove a cloud and praying for affirmative relief; and once in equity, as against the government asserting title, the defenses of equitable estoppel and laches, which are very potent on the facts in this case, are, of course, available. Sullivan Timber Co. v. Mobile, supra; State of Iowa v. Carr (C. C. A.) 191 F. 257; Carino v. Philippine Islands, 212 U. S. 449, 29 S. Ct. 334, 53 L. Ed. 594.

The decree of the District Court is affirmed, with costs.

ANDERSON, Circuit Judge (dissenting).

Ejectment is a suit at law in which the plaintiff is entitled to a jury trial under the Seventh Amendment of the Constitution of the United States—the supreme law of our land. A judgment for defendant, duly recorded, as it may now be under the Act of March 8, 1906 (Compilation of Rev. St. and Codes of Porto Rico, page 848), will effectually remove any alleged cloud on her title. She therefore had a plain, adequate, and complete remedy at law. Rev. St. § 723 (28 USCA § 384).

Moreover, unless the defendant had a good legal title, she had no occasion to resort to equity to remove an alleged cloud thereon. The prior adjudication of her legal right was therefore necessary for determining the existence of any equitable right. The dictum of Chief Justice Taft in Liberty Oil Co. v. Condon National Bank, 260 U. S. 235, 242, 43 S. Ct. 118, 121, 67 L. Ed. 232, that "the equitable issue raised should first be disposed of as in a court of equity," is obviously inapplicable to such a situation, where the very existence of an equitable issue is dependent upon the prior determination of a legal right. This dictum cannot properly be held to justify an evasion or defiance of the Seventh Amendment; for the Chief Justice also says: "The right of trial by jury is preserved exactly as it was at common law."

The holding that plaintiff, by filing a replication to defendant's answer in equity, waived its constitutional right to a jury, seems to me an unsound and most dangerous doctrine. At the very outset of the hearing before the court, plaintiff strenuously insisted on its right to a trial by jury. This was enough; there was no waiver.

Her title is grounded on tax deeds and prescription—possession for ten years in her predecessors in title,—a very flimsy foundation. Even in the present case, tried as an equity suit, possession for the prescriptive period was (as the majority opinion in effect concedes) a fair issue of fact for the jury. Plaintiff was constitutionally entitled to a decision of this issue by a jury.

Almost certainly both tax deeds were void, and furnished no just title for prescription. Lopez, Jr., had no possession of the 255 cuerda tract, except as a trespasser. His possessory title was without rightful legal foundation. Title to this tract was and remained in the crown as sovereign.

It is plain that public lands cannot be taxed. Iowa Homestead Co. v. Valley Railroad, 17 Wall. 153, 21 L. Ed. 622; Crilley v. Burrows, 17 Wall. 167 note, 21 L. Ed. 624; Braxton v. Rich (C. C.) 47 F. 178; Hall v. Dowling, 18 Cal. 619; Government of Philippine Islands v. Adriano, 41 Philippine R. 112, 118.

His title to the 100 cuerda tract was little better; for, by appropriate proceedings, the Canino conditional grant of 1847 was held forfeited for failure to cultivate, in accordance with the "indispensable condition."

After the decision of the Governor General, the Forestry Department took formal possession of the 100 cuerda tract in the name of the crown, and on August 3, 1883, a formal instrument signed by the forestry officials and Lopez (son and heir of the original Lopez) evidenced that possession, stating "that the guardia civil would be the principal custodians of same." This duly authenticated document was not inadmissible as hearsay. Compare Rev. Stats. and Codes, §§ 1437, 1438, 1439.

The court below excluded all of these records, concerning both tracts, as incompetent to affect the Livingston title under the Mortgage Law. This was error.

As already stated, defendant's title to the Canino tract, if any, is grounded on a tax deed and prescription. If the forfeiture was valid, there was no possibility of valid tax on public land, no "just title" to ground pre-

scription. Moreover, Lopez' written admission in 1883 of possession taken by the government was plainly competent on the question of possession. He claimed then to have title against the crown; on decision against him, he admitted possession taken by the crown. Only failure of the Spanish officials to record this final judgment in its favor furnished any color of title for this tract.

The argument of plaintiff's learned counsel that this judgment was not recordable under article 2 of the Mortgage Law is highly persuasive; it was not considered or apparently thought of by Chief Justice White in Romeu v. Todd, 206 U. S. 358, 27 S. Ct. 724, 51 L. Ed. 1093. The sound construction of article 2 seems to me to exclude, by necessary implication, all judgments except those under paragraph 4 adjudicating incapacity of persons to execute instruments of conveyance. Such was apparently the contemporaneous construction of the Spanish officials. Cf. Comp. Rev. Stat. & Codes, p. 1063.

The slur on the good faith of the Porto Rican officials in these proceedings seems to me entirely unwarranted. In my view, they acted properly and conscientiously in attempting to vindicate the public right to public lands, passing to this nation by the treaty of Paris.

The gist of the present decision, affirming the court below, is that the Act of March 3, 1915, enacting section 274b of the Judicial Code (28 USCA § 398), may be so used as to destroy the constitutional right to a jury trial given by the Seventh Amendment. From such a doctrine I emphatically dissent. American Mills v. American Surety Co., 260 U. S. 360, 363, 43 S. Ct. 149, 67 L. Ed. 306; Scott v. Neely, 140 U. S. 106, 110, 11 S. Ct. 712, 35 L. Ed. 358; Henrietta Mills v. Rutherford County, 281 U. S. 121, 127, 128, 50 S. Ct. 270, 74 L. Ed. 737; Whitehead v. Shattuck, 138 U. S. 146, 11 S. Ct. 276, 34 L. Ed. 873.