El Pueblo de Puerto Rico, demandante y apelado, *v.* Luis F. Velázquez, acusado y apelante.

No. 4927.—*Sometido:* Mayo 15, 1933. *Resuelto:* Diciembre 14, 1933.

*Pedro Albizu Campos*, abogado del apelante; *R. A. Gómez, Fiscal,* abogado de El Pueblo, apelado.

EL JUEZ ASOCIADO SEÑOR WOLF, emitió la opinión del tribunal.

Luis F. Velázquez fué acusado en la Corte Municipal de San Juan de haber perpetrado un acometimiento y agresión grave en la persona de Emilio del Toro, Juez Presidente de la Corte Suprema de Puerto Rico. En la acusación se expresa suficientemente que el supuesto delito tuvo lugar en San Juan y fué cometido mientras el Juez Presidente se hallaba en el desempeño de los deberes de su cargo. Después de un juicio *de novo* en la Corte de Distrito de San Juan el acusado fué convicto del delito imputádole y sentenciado a un año de cárcel.

En apelación al Tribunal Supremo de Puerto Rico, tanto el acusado como el fiscal de esta corte radicaron sus alegatos. Posteriormente, sin embargo, el apelante radicó una moción para desestimar el caso, alegando que El Pueblo de Puerto Rico no tenía jurisdicción sobre el delito ya que los hechos ocurrieron en un sitio que era de la propiedad exclusiva de los Estados Unidos. El caso fué señalado para vista y en

el día fijado las partes comparecieron por sus respectivos abogados y únicamente discutieron la cuestión de jurisdicción. Entonces ambas partes pidieron tiempo para radicar alegatos. El apelante repetidamente solicitó prórrogas que, considerando la seriedad de la cuestión envuelta, nos sentimos obligados a conceder, de suerte que el caso no nos fué finalmente sometido hasta el 15 de mayo de este año. En ese alegato el apelante se fundó exclusivamente en el caso de *United States* v. *Iglesias*, 13 P. R. Fed. 282. Intuitivamente puede decirse que la solución del problema no presentaba gran dificultad, pero según ocurre frecuentemente en lo judicial y aun en otras materias que han de ser objeto de decisión, los pasos justificativos de la conclusión no son tan fáciles de relatar.

El apelante sostiene que el cuartel de Santo Domingo era de la propiedad exclusiva de los Estados Unidos. Se alegó que ese cuartel perteneció a la Corona de España, aunque la Iglesia Católica reclamó la misma propiedad. La controversia entre los Estados Unidos y la Iglesia fué arreglada por una transacción en virtud de la cual la referida propiedad fué cedida o dada a los Estados Unidos o al Pueblo de Puerto Rico, según sea el caso. Cuando el hecho denunciado tuvo lugar, el piso bajo del edificio lo ocupaba la Comisaría del regimiento local del ejército de los Estados Unidos. El segundo piso estaba ocupado por la Corte Suprema de Puerto Rico y por parte de la Corte de Distrito de San Juan. En tiempos de España, la Audiencia Territorial celebraba sus sesiones en el edificio de Santo Domingo. Al hacerse cargo de Puerto Rico las autoridades militares, a la Corte Suprema de Puerto Rico y la de Distrito de San Juan se les dió permiso o se les dejó continuar con sus oficinas en el edificio de Santo Domingo. El Pueblo de Puerto Rico siguió ocupando el local, si no en virtud del permiso expreso de las autoridades militares, por lo menos en virtud de su tolerancia (*sufferance*) y consentimiento.

El artículo 33 de la Ley Orgánica de Puerto Rico de abril 12 de 1900, conocida como la Ley Foraker, disponía:

"Que el poder judicial residirá en las Cortes y Tribunales de Puerto Rico ya establecidos y al presente en ejercicio, incluyendo los Juzgados Municipales creados en virtud de la Orden General, número ciento diez y ocho, promulgada por el Brigadier General Davis, Voluntarios de los Estados Unidos, el 16 de agosto de 1899, incluyendo también los tribunales de policía establecidos por la Orden General, número ciento noventa y cinco, promulgada el 29 de noviembre de 1899 por el Brigadier General Davis, Voluntarios de los Estados Unidos, y las leyes y ordenanzas de Puerto Rico y sus municipios que están en vigor, en todo lo que no se oponga a la presente, declarándose subsistentes por esta ley dichas Cortes y Tribunales. La jurisdicción de estas Cortes y los trámites seguidos en ellas, así como los distintos funcionarios y empleados de las mismas, respectivamente, serán los que se definen y prescriben en dichas leyes y ordenanzas y las citadas Ordenes Generales, número ciento diez y ocho, y ciento noventa y cinco, mientras no se legisle otra cosa; *Disponiéndose, sin embargo:* que el Presidente y Jueces Asociados del Tribunal Supremo y el Márshal (Alguacil Mayor) del mismo, serán nombrados por el Presidente, con el concurso y consentimiento del Senado; y los Jueces de las Cortes de Distrito serán nombrados por el Gobernador, con el concurso y consentimiento del Consejo Ejecutivo, y todos los demás funcionarios y agregados de las demás cortes serán elegidos según disponga la Asamblea Legislativa, la cual tendrá autoridad para legislar de tiempo en tiempo, conforme tenga por conveniente, con referencia a dichas cortes, y cualesquiera otras que estime oportuno establecer; su organización, el número de jueces y funcionarios y agregados para cada una, su jurisdicción, sus procedimientos, y demás asuntos que las afecten."

Por lo menos tácitamente, hay varias frases en este artículo que demuestran que el estado de hechos existente con respecto a las cortes de Puerto Rico quedó en vigor por ministerio de esa Carta Orgánica. En la opinión del Juez de la Corte Federal, Sr. Odlin, se hace el comentario de que no hubo cesión alguna ni se pagó a los Estados Unidos compensación por el uso de ese local por El Pueblo de Puerto Rico. Sin embargo, la Corte Suprema de Puerto Rico se hallaba en completa ocupación del sitio referido, y ningún

oficial de los Estados Unidos o de su ejército impugnó la posesión por dicha corte. Por tanto, la Corte Suprema de Puerto Rico tiene derecho al beneficio de todas las presunciones que resultan de la posesión de una propiedad; como por ejemplo, que esa posesión es legal y al amparo de la debida autoridad. La Corte Suprema de Puerto Rico se hallaba allí con la licencia y autoridad de los Estados Unidos, si no por otros motivos.

El 1º. de julio de 1902 "el Congreso de los Estados Unidos aprobó una ley titulada 'Ley para autorizar al Presidente a reservar terrenos y edificios públicos en la Isla de Puerto Rico para usos públicos, para conceder otros terrenos y edificios públicos al Gobierno de Puerto Rico, y para otros fines,' cuya sección primera lee como sigue: 'El Presidente por la presente queda autorizado para, dentro de un año después de la aprobación de esta Ley, hacer aquellas reservas de terrenos y edificios públicos pertenecientes a los Estados Unidos en la Isla de Puerto Rico para fines militares, navales, de faros, de hospitales para marinos, oficinas postales, aduaneros, para las Cortes de los Estados Unidos y para otros fines, que él crea necesarias, y todos los terrenos y edificios públicos (excluyendo superficies de puertos, ríos navegables, cuerpos de agua, y los terrenos sumergidos bajo los mismos) poseídos por los Estados Unidos en dicha Isla y que no hayan sido así reservados, por la presente se conceden al Gobierno de Puerto Rico para ser usados en beneficio del Pueblo de dicha Isla; *Disponiéndose,* que esta cesión se hace con la condición expresa de que el Gobierno de Puerto Rico por su autoridad correspondiente, ceda a los Estados Unidos cualquier interés o participación que pudiera tener en los terrenos o edificios reservados por el Presidente, de acuerdo con las disposiciones de esta Ley; *Y disponiéndose, además,* que nada de lo que aquí se contiene será interpretado en el sentido de afectar cualquier derecho legal o en equidad que hubiere adquirido el Gobierno de Puerto Rico u otra persona, a virtud de contrato, arriendo o licencia hechos por

las autoridades de los Estados Unidos con anterioridad al primero de mayo de mil novecientos.' (32 Stat. at L. 731, cap. 1383, Comp. Stat., sec. 3761, 7 Fed. Stat. Ann. Supp. p. 1281)." *United States* v. *Iglesias,* supra. Las palabras "que nada de lo que aquí se contiene será interpretado en el sentido de afectar cualquier derecho legal o en equidad que hubiere adquirido el Gobierno de Puerto Rico u otra persona, a virtud de contrato, arriendo o licencia hechos por las autoridades de los Estados Unidos con anterioridad al primero de mayo del mil novecientos" eran un reconocimiento suficiente de la posesión de la Corte Suprema de Puerto Rico o del Pueblo de Puerto Rico de la parte del edificio en cuestión.

Merced a esta tolerancia o licencia, la Corte Suprema de Puerto Rico continuó ocupando el segundo piso del mencionado edificio hasta la fecha del supuesto delito.

A virtud de la ley del Congreso de 1902 ya citada, el Presidente fué autorizado a hacer reservas de propiedades, pero, en lo que atañe al cuartel de Santo Domingo, no hizo la reserva hasta el 1903, cuando ya había transcurrido cerca de un año. Mientras tanto, y hasta que efectivamente se hiciera la reserva, imperaba la jurisdicción de Puerto Rico de acuerdo con la ley misma. Según se ha dicho, la reserva fué en 1903, pero no se trató de privar a la Corte Suprema de Puerto Rico o al Pueblo de Puerto Rico del territorio reconocido por la referida ley de 1902. Estados Unidos no hizo tentativa alguna de tomar posesión del segundo piso del edificio.

La Constitución de los Estados Unidos dispone en la cláusula décimoséptima de la sección 8, artículo 1, que el Congreso tendrá poder para "legislar exclusivamente en todas las materias concernientes al distrito que por cesión de uno o varios Estados y aceptación del Congreso, haya sido elegido para residencia del Gobierno Federal, distrito cuya área no podrá exceder de diez millas cuadradas, y ejercer la misma facultad sobre todos los demás lugares comprados,

con el consentimiento de las Legislaturas de los Estados a que pertenecen, para la construcción de fortalezas, almacenes, arsenales, astilleros y otros edificios que se necesitaren.'' A tenor de este precepto y de otras leyes del Congreso promulgadas en cumplimiento del mismo, ha surgido un número de controversias entre los varios Estados de la Unión y el Gobierno de los Estados Unidos. Es incuestionable que cuando un estado cede una propiedad al Gobierno Federal, surge, por regla general, la jurisdicción de los Estados Unidos, según puede verse de las autoridades que citaremos más adelante. Existen excepciones cuando el estado cedente hace ciertas reservas. Sin embargo, cuando un edificio se usa para arsenal, oficina de correos, o algo por el estilo, por cesión de determinado estado, la jurisdicción exclusiva de los Estados Unidos generalmente impera, y un delito cometido en tal edificio debe, pues, ser perseguido por los funcionarios de los Estados Unidos como tales. Entonces los respectivos estados no tienen ulterior jurisdicción. Debe recordarse que la cuestión de si Puerto Rico puede considerarse como un estado en el sentido constitucional, depende del asunto de que se trate. Cabe decir ahora, y lo ampliaremos más adelante, que esencialmente no hay el mismo conflicto de jurisdicción entre un territorio de los Estados Unidos y los Estados Unidos, como entre esta nación y un estado. Asumiendo, por el momento, que la jurisdicción local de Puerto Rico puede contrastarse a la de los Estados Unidos en la misma forma que la de un estado, hay varias cosas que deben ser tenidas en cuenta. Una es que a fin de obtener jurisdicción exclusiva al amparo del precepto constitucional, la cesión debe hacerse por el estado mismo. No estamos muy seguros de que se hiciera tal cesión, aunque fuese autorizada por la Legislatura. Sección 1673 de los Estatutos Revisados; *People* v. *Fortuna Estates*, 279 Fed. 500, 507.

Otra cosa que debe notarse es que cuando aun teniendo la jurisdicción exclusiva, los Estados Unidos permiten que un estado ocupe para fines locales la propiedad cedida, los Es-

tados Unidos no alegan, ni pueden alegar tener, jurisdicción exclusiva.

El caso de *Palmer* v. *Barret*, 162 U. S. 399, es interesante. A decir verdad, el Estado de New York se reservó cierta jurisdicción. El estado hizo reserva de algunos derechos sobre los terrenos cedidos, pero el caso constituye autoridad para la teoría de que cuando hay dos gobiernos contratantes uno de ellos puede ceder, o puede no obtener, una jurisdicción exclusiva. En otras palabras, es potestativo de una de las altas partes contratantes no tomar jurisdicción exclusiva, aunque pudiera hacerlo. Otros casos sobre renuncia de jurisdicción por los Estados Unidos o por un estado, sobre el efecto de la misma, o sobre la retención de jurisdicción, son los siguientes: *United States* v. *Bateman*, 34 Fed. 86; *Exum* v. *State of Tennessee*, 90 Tenn. 501, 15 L.R.A. 381; *Fort Leavenworth R. R. Co.* v. *Lowe*, 114 U. S. 525; *Chicago & Pacific Railway Co.* v. *McGlinn*, 114 U. S. 542; *State* v. *Stevens*, 199 Pac. 256, 260; *State* v. *Frazier*, 18 Pac. 523; *People* v. *Burke*, 126 N. W. 446.

En vista de este caso sugerimos a las partes el de *In re Neagle*, 135 U. S. 1. Allí el supuesto delito fué claramente cometido dentro del Estado de California. Neagle fué encausado por haber acometido y dado muerte a Terry cuando el referido Neagle acompañaba al Juez Asociado Sr. Field mientras éste se hallaba en ejercicio de sus deberes como juez de la Corte Suprema de los Estados Unidos en circuito, habiendo Terry atacado al juez. La Corte Suprema de los Estados Unidos resolvió que un acometimiento a un juez de una corte de los Estados Unidos en el desempeño de sus deberes oficiales es una perturbación del orden público de los Estados Unidos, a distinción del orden público del estado donde se realiza el acometimiento.

La Corte Suprema de Puerto Rico y su antecesora, ocuparon el cuartel de Santo Domingo desde 1898 con el consentimiento de las autoridades militares. El Pueblo de Puerto Rico es un *quasi* soberano creado por el Congreso de los

Estados Unidos y su poder judicial reside en la Corte Suprema de Puerto Rico y otras cortes, a virtud de la Ley Foraker, la Ley Jones y aun de las órdenes militares. La jurisdicción de El Pueblo de Puerto Rico se extendió necesariamente a la Corte Suprema de Puerto Rico, que materialmente ocupaba parte del segundo piso del aludido edificio. Cuando a la Corte Suprema de Puerto Rico se le permitió ocupar el referido segundo piso por tantos años, el poder de policía de El Pueblo de Puerto Rico se extendió *pro tanto* a castigar delitos cometidos en esa parte del territorio ocupada con la aquiescencia de los Estados Unidos. Las leyes penales de Puerto Rico regían en cualquier sitio abarcado por el poder de policía de Puerto Rico. No podría decirse que los Estados Unidos tenían jurisdicción exclusiva sobre la totalidad del cuartel de Santo Domingo. La Corte Suprema de Puerto Rico, como una rama de El Pueblo de Puerto Rico, estaba en completa posesión de parte del segundo piso del edificio, y la corte de distrito tenía el resto del piso.

Según se ha indicado, hemos estado asumiendo que Puerto Rico puede considerarse localmente como un estado. En realidad de verdad no es así. No puede haber un posible conflicto fundamental de jurisdicción entre El Pueblo de los Estados Unidos y el de Puerto Rico. Estados Unidos es soberano en ambos casos. Nada fijaría esto con mayor claridad que el caso de *Grafton* v. *United States,* 206 U. S. 333. Grafton había sido convicto de un delito contra las leyes militares por una corte marcial en las Filipinas. El gobierno filipino trató de castigarle por el mismo acto cometido dentro del territorio de aquellas islas. La Corte Suprema de los Estados Unidos resolvió que esto sería exponerle dos veces a ser castigado por el mismo delito; que la prohibición de doble proceso (*former jeopardy*) es aplicable a todas las causas criminales en las Islas Filipinas; que el mismo acto, al ser cometido en un estado, podría constituir dos delitos distintos, uno contra los Estados Unidos y otro contra el estado, pero que la regla no se aplicaba a actos cometidos en

las Islas Filipinas. Los Estados Unidos o sus autoridades, civiles y militares, tienen derecho a permitir la ocupación de cualquier propiedad por el pueblo de un territorio. Y eso ocurrió en el caso presente. La jurisdicción de Puerto Rico, con el consentimiento de los Estados Unidos, se extendió al sitio en que fué cometido el delito. Para una paridad de razonamiento véase el caso de *Rivera et al.* v. *Lawton,* 35 F. (2d) 823.

No podemos convenir con el Juez de la Corte de Distrito de los Estados Unidos para el Distrito de Puerto Rico en que Estados Unidos tenía jurisdicción exclusiva sobre el cuartel de Santo Domingo, en yuxtaposición a la jurisdicción de Puerto Rico.

Entremos ahora en los méritos del caso. Entre otras cosas el apelante sostiene que no hubo un acometimiento y agresión grave; que el Juez Presidente no estaba en el ejercicio de sus deberes oficiales, sino que la evidencia trató de demostrar que él acababa de almorzar y se estaba dando paseos por su despacho al ser acometido por el acusado apelante en este caso. Es demasiado claro para que lo argumentemos ampliamente, que cuando un juez se halla en su corte, en el edificio en que desempeña sus deberes, descansando o pensando o leyendo, él está allí en ejercicio de sus funciones, a menos que y hasta tanto se demuestre lo contrario.

Un acometimiento y agresión grave existe ''1. Cuando se cometa en la persona de un funcionario legal en el cumplimiento de sus deberes, en caso de saberse o haberse hecho saber a la persona que cometiere el hecho, que la persona agredida era un funcionario en el desempeño de un deber oficial.'' Sección 5664 de los Estatutos Revisados de 1911. Pero también existe ''2. Cuando se cometiere en un tribunal de justicia,'' etc.

El apelante también sostiene que no hubo *mens rea;* que la agresión cometida por el acusado fué leve y con el mero propósito de exigir, de caballero a caballero, una satisfacción

del Juez Presidente a causa de ciertas manifestaciones hechas por éste en un acto público; que el acusado hizo el ataque en justificación de sus propias ideas políticas. Sin embargo, una mera diferencia de credo político no justifica un acometimiento y agresión. El hecho de que lo que el acusado hizo fué un reto no lo coloca fuera de la regla general. La Constitución y las leyes de los Estados Unidos, en lo aplicables, así como las leyes de Puerto Rico, abarcan todo el territorio bajo la jurisdicción de Puerto Rico, y la intención (*intent*) emana del acto cometido y no queda afectada por el designio sugerido en este caso.

No hallamos motivo para intervenir en la discreción de la corte inferior al imponer la pena.

*Debe confirmarse la sentencia apelada.*

El Juez Presidente Señor del Toro no intervino.